# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:14 CR 88 RWS(SPM) |
| | ) | |
| TIMOTHY LAMONT RUSH (2), | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

All pretrial matters in this case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C.§636(b). On October 11, 2017, this matter came before the Court for a hearing on Defendant Timothy Rush's Second Motion to Reconsider detention and for release pending trial (Doc. 468 & 506), which is opposed by the United States. (Doc. 473 & 503). Rush contends evidence that was not available at the time of his initial detention hearing disclosed during the course of this case entitles him to pretrial release under the Bail Reform Act. In the alternative, Rush contends his pretrial detention, which currently stands at 44 months, has become unconstitutionally excessive. For the reasons set out below, I find that Rush is not entitled to relief under the Bail Reform Act but is entitled to pretrial release on due process grounds.

## I.    PRETRIAL RELEASE UNDER THE BAIL REFORM ACT

Under the Bail Reform Act, a judicial officer may reopen a detention hearing at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are

conditions of release that will reasonably assure the [defendant's appearance] as required and the safety of any other person and the community." 18 U.S.C. §3142(f). In determining whether there are conditions of release that will reasonably assure the safety of the community and the appearance of the defendant, the Court must consider (1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person including, among other things, the person's character, length of residence in the community, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and whether at the time of the current offense or arrest the person was on probation, on parole, or on other release pending completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. §3142(g).

Under the Bail Reform Act, the United States has the burden of establishing by clear and convincing evidence that there are no conditions that will reasonably assure the safety of the community and, by a preponderance of the evidence, that there are no conditions that will reasonably assure the defendant's appearance. However, because Timothy Rush was accused in an indictment of violating the Controlled Substances Act and faced a maximum prison term of ten years or more, the United States was entitled to a rebuttable presumption that no condition or combination of conditions would reasonably assure Rush's appearance and the safety of the community. 18 U.S.C. §3142(e)(3). In light of this presumption, Rush had the burden of producing some evidence that there were conditions of release which would reasonably assure he would not pose a danger to the community and would not flee. *United States v. Abad*, 350 F.3d

793, 797 (8th Cir. 2003). However, even if Rush produced evidence sufficient to rebut the presumption, the statutory presumption would not disappear; rather, the court must consider the presumption along with all other evidence and determine whether the evidence as a whole supports pretrial detention. *Id.*

The undersigned applied the foregoing factors and ultimately granted the United States' motion for pretrial detention because, notwithstanding defendant's strong familial and community ties, an order of detention was appropriate when the rebuttable presumption was considered together with Rush's history and personal characteristics. *See* Doc. 41. Specifically, as the detention order noted, although Rush provided some financial support to his mother and had strong family and community ties, Rush was unemployed; used heroin on a weekly basis; and had an extensive criminal history dating back to 1982 that included two prior federal drug convictions. Rush's criminal history also reflected that Rush was on parole at the time of the instant charges and reflected a poor history of compliance while on supervision, including a history of absconding from supervision.

Rush contends that evidence disclosed by the United States in the years since the initial order of detention has a material bearing on the issue of whether there are conditions of release that will reasonably assure his appearance and the safety of any other person and the community." 18 U.S.C. §3142(f). The evidence relied on by Rush was the subject of a *Franks* hearing that spanned nine hearing days held over a period of several months.[1] More specifically, Rush and his co-defendants have argued that evidence presented during the *Franks* hearing demonstrates that the application for the Title III wiretap of Defendant Gatling's telephone,

---

[1] The evidentiary hearing began on October 17, 2016, and continued October 18-21, 2016; January 9-10, 2017, January 19, 2017, and February 14, 2017. The parties requested time to file post-hearing briefs. The *Franks* motion was fully briefed and deemed submitted on September 21, 2017.

which served as the cornerstone of the United States' investigation into Rush and his co-defendants, contained false statements and material omissions that deprived the warrant authorizing the wiretap of probable cause. As such, defendants contend, all electronic surveillance evidence seized as a result of the wiretap, including evidence seized from subsequently authorized wiretaps, must be suppressed.

Rush contends evidence revealed through disclosures from the United States and presented at the *Franks* hearing goes to the weight of the United States' case against him, which is one of the factors the Court must consider in evaluating whether to detain under the Bail Reform Act. While I certainly considered the strength of the government's case, (including evidence that there were Title III wire intercepts), in assessing whether or not to grant the United States' motion for pretrial detention, the strength of the government's case was not material to the order of detention. Rather, as reflected in the detention order, and set out above, Rush's personal history and characteristics such as lack of employment, extensive and serious criminal history, repeatedly poor performance while under court supervision, ongoing, chronic, and long-term history of substance abuse, and evidence that he was under supervision at the time of the instant arrest together with the rebuttable presumption for detention drove the decision to detain him pending trial. I also considered Rush's criminal history which reflected that he was on parole at the time of the instant charges and had a poor history of compliance while on supervision, including a history of absconding from supervision.

In addition, as the United States pointed out in its response, it appears that even if Rush were to prevail on the *Franks* motion, it is not at all clear that the strength of the United States' case against Rush would be greatly diminished. Rush is implicated primarily as the driver in connection with the purchase of sham narcotics in DEA reverse sting operations that took place

in February 2013. Rush has failed to explain how, if at all, suppression of wire-intercepted evidence obtained from Gatling's phone would take away from evidence derived from the reverse sting operations at the heart of the United States' case against him. In sum, even if the factual issues in the *Franks* motion are decided in Rush's favor, that result, standing alone, would not be a basis for reconsidering pretrial detention under the Bail Reform Act.

Other than evidence presented at the *Franks* hearing, defense counsel offered little in the way of new evidence that was not previously considered by the Court. For the reasons already stated, the evidence related to the *Franks* hearing is not material to the analysis under the Bail Reform Act.

Evidence proffered at the hearing that was both new and material to the pretrial detention inquiry included evidence that (i) Rush is currently sober due to his years of pretrial incarceration; (ii) after years of pretrial discovery there is nothing to suggest that Rush's role in the reverse sting operations was any more significant than that of driver; (iii) there is no evidence that Rush had any weapons or money on his person at the time of the sting operations; (iv) there is no evidence that Rush has, either on his own or at the direction of Gatling or anyone else, perpetrated any acts of violence against a witness, victim, or suspected informant in connection with this case; and (v) there is no evidence that Rush had any involvement in the murder of his alleged co-conspirator Morgan.

The foregoing evidence, which was unknown at the time of the initial detention hearing, tends to favor Rush and, to some extent, makes the question of whether there is clear and convincing evidence that no conditions would reasonably assure the safety of the community a closer one. However, other than evidence of Rush's current state of sobriety, none of this new evidence addresses the primary concerns reflected in the initial detention order. As such, the new

evidence presented by Rush is not sufficient to overcome the key factors on which the initial order of detention were predicated: namely, the presence of the rebuttable presumption together with Rush's extensive criminal history; Rush's equally extensive history of poor performance while under supervision; and Rush's apparent propensity for committing new crimes while still completing a sentence for another offense.

In sum, for all of the foregoing reasons, the new evidence presented by Rush is either not material to the inquiry under the Bail Reform Act or, due to other evidence in the record as a whole, the new evidence is not a sufficient basis under the Bail Reform Act for ordering that Rush be released pending trial.

## II.  PRETRIAL RELEASE ON DUE PROCESS GROUNDS

Defendant Rush argues, in the alternative, that he should be released because his pretrial detention, which currently stands at 44 months, has become unconstitutionally excessive. The Due Process Clause of the Fifth Amendment provides that ''No person shall . . . be deprived of life, liberty, or property, without due process of law[.]'' U.S. Const., Amend. V. An individual may be detained prior to trial without violating that clause so long as that confinement does not amount to ''punishment of the detainee.'' *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). This is because, although ''[l]iberty is the norm,'' the ''government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.'' *United States v. Salerno*, 481 U.S. 739, 748 & 755 (1987).

Neither the Supreme Court in *Salerno* nor any lower court confronted with this issue has set a bright-line limit that demarcates when continued pretrial detention violates due process. *See Salerno* 481 U.S. at 747 n.4 (noting "[w]e intimate no view as to the point at which detention in a particular case becomes excessively prolonged, and therefore punitive, in relation to Congress'

regulatory goal."). *See also United States v. Taylor*, 602 F. App'x. 713, 717 (10th Cir. 2015) (citation omitted) (noting that ''pretrial detention for a lengthy period of time may implicate due process concerns'' but '' 'the Constitution imposes no bright-line limit on the length of pretrial detention' ''); *United States v. Briggs*, 697 F.3d 98, 101 (2nd Cir. 2012)(''We have consistently held that due process places no bright-line limit on the length of pretrial detention'').

Instead, the issue of whether pretrial detention is unconstitutionally excessive is examined on a case-by-case basis. Courts have developed and applied the following non-exclusive factors when deciding whether continued pretrial detention would violate due process: (1) the non-speculative length of expected confinement; (2) the extent to which the government bears responsibility for delay; (3) the gravity of the charges; and (4) the strength of the evidence justifying detention including the existence of any rebuttable presumption for detention. *See United States v. Watson,* 475 Fed. Appx. 598, 601 (6th Cir. 2012)*; Briggs,* 697 F.3d at 101; *United States v. Hare,* 873 F.2d 796, 801 (5th Cir. 1989); *United States v. Kramer,* No. CR 16-05-BLG-SPW-TJC-4, 2017 WL 1317535 *3 (D. Montana Mar. 20, 2017); *United States v. Omar,* 157 F. Supp.3d 707, 715 (M.D. Tenn. 2016).

Although no one factor is dispositive, a review of the cases confronting due process challenges suggests that the longer the detention, the more weighty countervailing concerns must be. Where pretrial detention is very long, typically two years or more, continued detention is justified only where the government is not responsible for any significant portion of the delay and special circumstances indicate that the defendant's release would pose an extraordinary threat to the legitimate regulatory goals requiring pretrial detention. *See Briggs,* 697 F.3d at 101 ("The longer the detention, and the larger the prosecution's part in prolonging it, the stronger the evidence justifying detention must be if it is to be deemed sufficient to justify the detention's

continuance"); *Omar,* 157 F. Supp.3d at 715 (where defendant was detained for more than four years pending trial on sex trafficking charges, "if not the rare case where the length of pretrial detention alone amounts to a due process violation;" the case came close and "at a minimum, the extended length of pretrial incarceration call[ed] for heightened scrutiny"); *United States v. Aileman,* 165 F.R.D. at 586-89 (canvassing the law and holding where non-speculative length of detention would be at least thirty-five months, the other two factors of the due process analysis—government responsibility for delay and threats to the government's regulatory interests—needed to weigh strongly in favor of the government to justify continued detention); *United States v. Rodriguez,* No. 09-CR-331A, 2012 WL 6690197 at *11 (W.D.N.Y. Dec. 12, 2012) (canvassing cases from the Second Circuit and holding that 50 month detention of defendant charged with gang-based racketeering related to drug trafficking activity and possession of a firearm in furtherance of drug crimes presented "rare case" where length of pretrial detention alone offended due process, where the case was still many months away from being ready for trial).

### A. <u>Non-Speculative Length of Expected Confinement</u>

There is no dispute the duration of detention in this case falls squarely in the "very long" category. As of the writing of this order Rush has been in custody for 44 months. By the United States' estimation, March 2018 is the earliest this case will likely be ready to go to trial. As such, the earliest defendant can expect to go to trial is 4 years (48 months) after he was ordered detained pending trial. However, as defense counsel accurately pointed out during the hearing, a March 2018 trial date seems overly optimistic given the status of pretrial matters. Although the *Franks* issue is now submitted and ready for a ruling, the defendants reserved their right to file other pretrial motions related to physical evidence, statements, and other non-electronic surveillance evidence. Those deadlines have yet to be set and any pretrial motions related to non-

electronic evidence have yet to be filed and resolved. In sum, the non-speculative length of expected confinement in this case is no less than and, in all likelihood, will exceed 48 months.

Given that the length of detention in this case is approaching a duration that some courts have found, standing alone, offend due process, this factor weighs very heavily in favor of Rush.

### B. The Extent to Which the Government Bears Responsibility for Delay

Where, as here, the length of pretrial detention exceeds two years, courts have typically upheld detention only if the government was not responsible for any significant portion of the delay and special circumstances indicated that the defendant's release would pose an extraordinary threat to the government's regulatory interests in detention. *See Omar,* 157 F. Supp.3d at 716 (quoting *United States v. Cos*, No. CR 05-1619 JB, 2006 WL 4061168, at *6–7 (D.N.M. Nov. 15, 2006)); *Aileman,* 165 F.R.D. at 589. In determining whether a lengthy period of pretrial detention has offended due process, the Court need not determine with precision the amount of pretrial delay attributable to the prosecution or assess the extent to which the Government may have been "at fault" in contributing to the delay. *United States v. Gonzales Claudio,* 806 F.2d 334, 342 (2d Cir. 1986). *See also United States v. Hofstetter,* No. 3:15-CR-27-TAV-CCS,  2017 WL 4079181 at *6 (E.D. Tenn. Sept. 14, 2017) (quoting *Gonzales Claudio,* 806 F.2d at 342). Rather, it is sufficient to determine whether "even if not deserving of blame or fault, the Government bears a responsibility for a [significant] portion of the delay." *Gonzales Claudio,* 806 F.3d at 342-343. Thus, delay caused even by neutral reasons, such as strategic case management choices that foreseeably extend the case, may be attributable to the government. *Rodriguez,* 2012 WL 6690197, at *12-13; *Hofstetter,* 2017 WL 4079181, at *7.

At the outset, it is important to point out that, from its inception, this case was designated a complex case that warranted an order permitting the case to proceed beyond the limits set out

in the Speedy Trial Act. Over time, however, the case became more complex due to a combination of circumstances, some of which were beyond the control of any of the parties or their respective attorneys. More specifically, during the course of this already complex case, prosecutors learned that DEA agents from Atlanta, who provided information material to the investigation, were under investigation for professional misconduct. The prosecutors promptly notified the Court and defense counsel about the investigation. The internal DEA investigation eventually evolved into a criminal investigation that became the centerpiece of a challenge by all defendants in this case to the constitutionality of judicially-authorized wiretap evidence the prosecution intends to use at trial. In addition to this unanticipated development, this case evolved from a long-term drug trafficking conspiracy into one involving charges for continuing criminal enterprise for alleged conduct dating back to the 1980's, and death penalty-eligible charges for two of Rush's co-defendants. It appears from the record that the government may have merged a separate parallel investigation related to two of Rush's co-defendants (Gatling and Andre Rush) into this case.

There is no dispute that unusual circumstances that developed during the case dramatically increased the complexity of an already complex case and served as a recipe for delay beyond what would normally occur in a long-term drug conspiracy case. However, setting aside the unusual and complicating circumstances that were beyond any party's control, as described in greater detail below, there were delays in this case that were the consequence of strategic decisions made by defendants, strategic decisions made by the government, and delays related to the justice system. While the government should not be charged with delays due to circumstances beyond the control of any party, or resulting from decisions made by defendants, in the context of this due process analysis, the government must be held accountable for delays

resulting from strategic choices it made and delays caused by the justice system. *See Aileman,*
165 F.R.D. at 592 (canvassing case law and concluding that unnecessary delays caused by
"courts" and the "justice system" are chargeable against the "government" in due process
analysis).

### 1) *Delay Beyond Limits Set by the Speedy Trial Act*

The case was initially brought by one set of prosecutors—Assistant United States
Attorneys Matthew Drake ("AUSA Drake") and Jeannette Graviss ("AUSA Graviss")—but was
eventually taken over by another set of prosecutors—Assistant United States Attorneys Dean
Hoag ("AUSA Hoag") and Michael Reilly ("AUSA Reilly"). At the arraignment on the first
indictment on March 31, 2014, AUSA Drake announced that the United States would need time
to turn over discovery, and requested that the case be designated as complex because, among
other reasons, it involved a long-term drug conspiracy and the discovery was voluminous, was
electronically stored, and would encompass unindicted crimes including murder of the alleged
co-conspirator. Timothy Rush did not object to the complex case designation and, on April 9,
2014, the case was so designated. (*See* Doc. 61).

Based on discussions between the Court and counsel at a status hearing on April 28,
2014, regarding the volume of the discovery and the format of the discovery, defendants were
granted approximately six months, through October 31, 2014, to review the voluminous
discovery and file pretrial motions related to electronic surveillance evidence. Evidentiary
hearings were set for December 1, 2014. All other pretrial motions were due November 14,
2014, with evidentiary hearings set during the week of December 8, 2014. (*See* Doc. 66).

The seven month period that elapsed between the arraignment and defendants' deadline
for filing pretrial motions is purely a product of the complexity of the case, as it was understood

at the time, and cannot fairly be chargeable against either party. *See Briggs,* 697 F.3d at 102

(delays resulting solely from inherent complexities in large multi-defendant case were not

chargeable against the government).

### 2) *Delays Resulting From Pending Charging Decisions and Lack of Access to E-Discovery*

Shortly before the October 31, 2014, pretrial motion deadline for electronic surveillance

evidence, the undersigned learned at a status hearing that defendants would need an additional

ninety (90) days before they would be in a position to file pretrial motions. Three seemingly

independent reasons were cited as the reason for the delay. Specifically, AUSA Drake

announced that the United States intended to file a superseding indictment that would add

allegations, including allegations of homicide, that may potentially allow enhanced sentences for

at least two of the four named defendants. AUSA Drake indicated that because the new

allegations may render those defendants eligible for the death penalty, before superseding, the

United States' Attorney's Office was seeking prior authorization from the Department of Justice

on an expedited basis to not seek the death penalty. AUSA Drake felt that the prior authorization

was necessary before the United States could file the superseding indictment, but was unsure

when he would receive an answer from the Department of Justice. AUSA Drake expressed his

belief that, because the United States had already included evidence related to the, as yet,

unindicted charges in its disclosures, any impact on pretrial motions would be minimal.[2]

The second reason given at the status hearing for extending the pretrial motion deadlines

was the existence of a separate ongoing investigation that could result in a new indictment

---

[2] This prediction did not turn out to be entirely accurate. As discussed in greater detail, *infra*, the superseding indictment added significant new counts against Defendants Gatling and Andre Rush. Those additional counts resulted in the government's disclosure of voluminous new discovery.

asserting very serious charges, including potentially death-eligible charges, for at least two of the defendants in the case. All counsel agreed that although the investigation involved a different set of facts, an indictment in a parallel case could impact decisions defendants in this case may make about pretrial matters. AUSA Drake was not involved in the parallel investigation but said he would advise the Court and defense counsel of the anticipated time frame for the conclusion of that investigation and any new indictment.

Finally, during the status hearing the Court and all counsel discussed various barriers the detained defendants and their respective counsel were having in reviewing the extremely voluminous electronically stored information. Some of the issues related to the manner in which the discovery was assembled by the United States; other issues related to delays in the United States making available affidavits filed in support of applications for electronic surveillance, including wiretaps and other electronic evidence; and other issues related to logistical problems at the local jails housing defendants including their refusal to allow defendants to access court-supplied computers for more than one hour a day and/or refusal to allow defendants to access attorney-supplied computers to review the electronic discovery. In light of the foregoing issues discussed at the hearing, defendants requested, and were granted, a continuance of ninety (90) days to January 30, 2015, to file pretrial motions related to electronic surveillance evidence. *See* Doc. 94.

Most, if not all, of the ninety (90) day extension of the pretrial motion deadline is attributable to the government. First, while I understand and commend the government's decision to wait for prior authorization to not seek the death penalty before filing a superseding indictment that might include death-eligible charges, such a delay was not required. This is evidenced by the fact that prosecutors in this case ended up superseding two months ***before***

receiving official notification that they would not be required to seek the death penalty. *See* Docs. 179 & 254. Second, the decision to take a wait-and-see approach regarding the separate investigation that could result in a new indictment against some of the defendants in the case was a choice made exclusively by the government; and, as at least one court has recognized, such choices have consequences, particularly when defendants are in custody while awaiting trial. *See Hofstetter,* 2017 WL 4079181 at *7.

Finally, although the e-discovery accessibility issue was primarily an issue at the jails, because the jails housing defendants are inherently part of the "judicial system" and because there is no evidence that the defendants caused delay on that score, delays related to difficulties in-custody defendants had accessing e-discovery is attributable to the government. *See Aileman,* 165 F.R.D. at 592 (canvassing case law and concluding that unnecessary delays caused by "courts" and the "justice system" are chargeable against the "government" in due process analysis).

### 3) *Delays Caused by Defendants' Requests to Continue Pretrial Motion Deadlines and Hearing for First Indictmen.*

As the January 30th pretrial motion deadline approached, detained defendants argued they continued to have trouble accessing electronically stored discovery.[3]  The Court and counsel discussed, at length, possible solutions to the issues, including the use of an interview room in the courthouse for the purpose of permitting detained defendants to review electronically stored discovery. Notwithstanding the issues defendants claimed they were experiencing, defense counsel requested only a seven day continuance of the January 30, 2015, pretrial motion

---

[3] For example, Defendant Gatling filed a motion outlining the issues he was facing at his jail. *See* Doc. 98. Although all of the issues were not uniform, Defendant Gatling's motion is illustrative of the issues generally discussed on the record at the hearing.

deadline. That request was granted and the deadline for filing pretrial motions was extended to February 6, 2015, with evidentiary hearings to be set during the week of March 2, 2015. *See* Doc. 107.

On February 6, 2015, defendants, including Timothy Rush, filed pretrial motions.[4] The undersigned directed the United States to respond by February 20, 2015, and scheduled consolidated evidentiary hearings on March 12, 2015. Doc. 116. After requesting multiple extensions of the deadline for responding to pretrial motions, the United States filed its responses on March 4, 2015. Docs. 122, 123 & 12). However, the consolidated evidentiary hearing scheduled on March 12, 2015, was continued to April 27, 2015, at the request of retained counsel for Defendant Gatling, who cited multiple scheduling conflicts. *See* Doc. 124 & 126.

Most, if not all, of the foregoing delay of approximately 45-55 days are attributable to the defendants, and specifically to Defendant Gatling.

### 4) *Delays Caused by Disclosure of DEA Internal Investigation and Change of Defense Counsel*

Several new developments arose that derailed the evidentiary hearing scheduled for April 27, 2015. By way of background, the investigation into the defendants' alleged drug trafficking activities was initiated after DEA case agents in St. Louis received information from a confidential source from Atlanta, identified in this case as CS1. Information provided by CS1 was used to support the government's application for judicial authorization for interception of wire communications for a target telephone associated with Defendant Gatling. When former retained counsel for Gatling filed his motion to suppress wiretap evidence on February 6, 2015, the motion and attachments were not filed under seal and one of the attachments disclosed the

---

[4] Timothy Rush filed a motion to suppress wire communications (Doc. 110) and a Motion to Dismiss the Indictment (Doc. 111).

identity of CS1. Beginning in early March 2015, CS1 expressed concern to DEA agents in Atlanta both about her own personal safety and about the reputation and safety of a friend who is referenced in the Title III wire affidavit.

On March 18, 2015, former retained counsel for Gatling advised the government via email that CS1 had contacted one of his associates and reported the wiretap affidavit was factually inaccurate. CS1 also reportedly told the associate that the DEA agent in Atlanta who was referenced in the affidavit had been suspended or was under investigation. Attorneys for the government apparently looked into the allegations and, shortly before the hearing scheduled on April 27th, advised the Court that the DEA Office of Professional Responsibility ("OPR") was, in fact, investigating one or more agents who provided material information to the investigation in this case for possible professional misconduct.

In the midst of these revelations, retained counsel for Defendant Gibbs was hired as an Assistant United States Attorney and had to withdraw from his representation of Gibbs. On April 10, 2015, based on representations that Gibbs could not afford to retain new counsel, the Court appointed CJA panel attorney Steve Welby to represent Gibbs.[5] Welby promptly filed a motion requesting that the hearing scheduled on April 27, 2015, be continued for a period of thirty (30) days so that he could prepare. I granted Welby's request and converted the evidentiary hearing scheduled on April 27, 2015, into a status and scheduling conference. (Docs. 136 & 137).

At the April 27th status hearing, AUSA Graviss disclosed the OPR internal affairs investigation to all counsel. Because it was unclear that the targets of the investigation were even aware of the investigation, AUSA Graviss made the disclosures at a sidebar and requested that

---

[5] Mr. Welby was subsequently appointed as the Federal Public Defender for the Southern District of Illinois and was reappointed, in that capacity, to continue his representation of Mr. Gibbs.

the record be sealed. During the course of discussion at sidebar, AUSA Graviss acknowledged that, based on what she knew of the investigation, all defendants were entitled to a *Franks* hearing. AUSA Graviss further acknowledged that defense counsel were entitled to additional disclosures relative to the investigation pursuant to the government's obligations under *Brady, Bagley, and Giglio. See* Doc. 139. AUSA Graviss indicated that she would disclose the information subject to a protective order which would be filed immediately. *Id.* Because defendants had already filed pretrial motions at the time of the hearing, I reopened the pretrial motion deadlines to allow defendants time to supplement their previously filed motions and to file any other substantive pretrial motions that are unrelated to electronic surveillance evidence. *See id.*

Based on the discussions held both on the record in open court and at sidebar, as newly appointed counsel for Gibbs, Welby made an oral motion to continue the evidentiary hearing for at least ninety (90) days. *Id.* There were no objections to the request and it was granted. Following the hearing, the government was required to make disclosures about the OPR investigation to defendants by May 7, 2015, and defendants were required to file any supplemental motions under seal on or before June 22, 2015. The evidentiary hearing was rescheduled to August 4 and 5, 2015.

Based on the foregoing facts, it appears that an internal OPR investigation was underway at least as early as March 2015, but the prosecutors in this case did not become aware of it until CS1 contacted Gatling's attorneys. Although I find that the belated disclosure of the OPR investigation on April 27, 2015, contributed to the need to continue the evidentiary hearing to August, it was neither the sole nor most significant cause of delay. Indeed, pretrial motions were filed in early February 2015, with briefing completed in early March 2015. Thus, it appears that

even if the government had more promptly disclosed the OPR investigation, the disclosure would still have occurred *after* defendants filed their pretrial motions; as such, defendants would still have been entitled to additional time to review materials related to the OPR investigation and to decide whether or not to supplement their existing pretrial motions.

The need to continue the evidentiary hearing to August 2015 was also driven in part by the change of counsel for Defendant Gibbs. Gibbs' new attorney, Steve Welby, requested a continuance of the hearing for 90 days to get up to speed with respect to both the prior disclosures and the OPR-related materials discussed at the April 27th hearing. Thus, it appears that Gibbs' change in counsel was a significant cause of this delay.

For all of the foregoing reasons, this roughly 90-day delay of the evidentiary hearing from April 27, 2015 to August 4, 2015, is not chargeable to the government.

### 5) *Delays Caused by the Superseding Indictment and Additional OPR and OIG Disclosures*

On May 7, 2015, I entered a protective order that cleared the way for the government to begin disclosing information relevant to the OPR investigation. Doc. 144. It appears from the record that the government made some disclosures related to the OPR investigation in May 2015. Based on those disclosures, and consistent with the amended scheduling order, defendants filed their supplemental suppression motions and requested a *Franks* hearing on or shortly after the filing deadline of June 22, 2015. However, the evidentiary hearing scheduled for August 4 and 5, 2015, never took place because, on July 16, 2015, the government filed a superseding indictment. Doc. 179.

The superseding indictment added two additional drug trafficking counts against Timothy Rush that included specific drug quantities and one additional incident not included in the initial indictment. Otherwise, the charges against Timothy Rush were identical to the charges in the

initial indictment. The superseding indictment also added two additional drug trafficking counts against Gibbs but added five new counts against Gatling, and four new counts against Andre Rush that included, among other things, death penalty-eligible charges such as killing a witness/informant as retaliation for cooperating with law enforcement and possession of a firearm in furtherance of a drug trafficking crime resulting in death.

Before the superseding indictment was filed, AUSAs Drake and Graviss withdrew and AUSAs Reilly and Hoag entered for the government. The charges in the superseding indictment brought by AUSAs Reilly and Hoag appear to be the culmination of the parallel investigation hinted at by AUSA Drake at the October 2014 status hearing. As a result of this roughly nine-month delay in filing a superseding indictment, defendants were confronted with voluminous new discovery that, according to AUSA Hoag, covered a roughly twenty-year period. *See* Doc. 194. This voluminous new discovery was introduced into the case at a point when defendants were expecting to proceed with an evidentiary hearing on their previously filed (and supplemented) pretrial motions. Given the volume of the discovery, at the arraignment which was held on August 4, 2015, I gave defendants sixty days, through November 4, 2015, to review the new disclosures and decide whether or not to file any pretrial motions related to the superseding indictment. *Id.*

Shortly before the scheduled status hearing on November 4, 2015, defendants jointly moved for an additional sixty (60) days to review disclosures made by the government. (Doc. 206). At the status hearing on November 4, 2015, AUSAs Reilly and Hoag announced that there was additional information related to the internal investigation as well as a criminal investigation by the Office of the Inspector General ("OIG") that they had only recently learned about. They further advised that they expected to receive and disclose the additional documents to defense

counsel within the next two to three weeks. Doc. 208. In light of the revelation that defense counsel could expect to receive additional relevant information in two to three weeks, I granted defendants' request for a sixty day extension and continued the deadline for defendants to file any supplemental pretrial motions to December 18, 2015. *Id.*

At the status hearing on December 18, 2015, the government announced that it was prepared to disclose additional OPR and OIG materials to defense counsel but requested a disclosure procedure that was dramatically more restrictive than the procedures outlined in the protective order that was already in place for the previously disclosed OPR materials. The government submitted a written motion in support of the request which defense counsel naturally wanted time to review and, if necessary, to file objections. *See* Docs. 220 & 222. The government further proposed that the Court conduct an *in camera* review of the materials to assess whether the requested procedure was necessary under the circumstances. Defendants were granted time to object to the government's proposed procedure. The deadline for defendants to file or supplement pending pretrial motions was continued to March 25, 2016.

After reviewing the written objections of defendants and conducting an *in camera* review of the OPR and OIG materials, on February 9, 2016, I denied the government's request for enhanced disclosure procedures and essentially adopted protections similar to those set out in the previously entered protective order. *See* Doc. 243. Following that ruling, the government began producing additional OPR and OIG documents to defense counsel sometime in February 2016. The government made disclosures of these materials on a rolling basis throughout March, April, and early May 2016. All told, the government produced over 1,100 pages of OIG interview transcripts and over 2,300 pages of OPR interview materials between March and the early part of May 2016.

The OPR and OIG documents required special scrutiny and redaction by the different teams of lawyers handling the internal investigation and this case. For example, some of the documents contained sensitive information that might disclose the identity of one or more DEA confidential informants. These documents also required special scrutiny because the alleged misconduct under investigation was not limited to this case. As such, some of the documents contained references to other unrelated DEA investigations that the agency did not want disclosed. This need for special scrutiny and redactions contributed to the slow and somewhat piecemeal manner in which the OPR and OIG materials were turned over to defense counsel throughout the Spring of 2016.

On April 25, 2016, I set a final deadline for supplemental pretrial motions of May 13, 2016, and scheduled an evidentiary hearing to begin on June 23, 2016. *See* Doc. 256. At defendants' request, the evidentiary hearing was ultimately rescheduled to October 17, 2016, so that defendants could secure the presence of DEA agents identified in the OPR and OIG investigations at the hearing. *See* Docs. 283, 298 & 303. The hearing began as scheduled on October 17, 2016 and, after nine hearing days held over the course of several months, the hearing was completed on February 14, 2017.[6]

As the foregoing demonstrates, approximately 16 months elapsed between the time the government disclosed the existence of the OPR investigation in late April 2015, and the first day of the *Franks* hearing in October 2016. Some portion of this delay (approximately 7 months) was caused primarily by defendants and/or decisions by their attorneys and cannot properly be

---

[6] The hearing was continued several times to accommodate witness schedules and requests by defense counsel and/or the government for time to obtain and review additional evidence in response to testimony given during the evidentiary hearing. Those delays were the result of the demands of the case and cannot fairly be attributed to any party.

attributable to the government. For example, as discussed above, a delay of approximately 90 days is attributable to the change of Gibbs' counsel in April 2015, and the need for new counsel to get up to speed. Some of the delay is also attributable to the change of Gatling's counsel. However, the change of Gatling's counsel was prompted, in part, by the introduction of death-eligible counts in the superseding indictment. As such, any delays arising from the change of Gatling's counsel is chargeable, at least in part, to the government. Finally, defendants' request to continue the evidentiary hearing in June 2016 (approximately 4 months) so that they could secure the presence of government agents at the evidentiary hearing, also makes up part of this delay and cannot be attributed to the government.

However, the bulk of the delays between summer 2015 and spring 2016 were the result of strategic decisions made by the government. For example, as discussed above, the government made the decision to wait nearly nine months before filing a superseding indictment. Based on the charges added to the superseding indictment, they appear to be based on conduct that the government was aware of from the start of the case and that may have been the subject of a separate investigation that, based on statements by prosecutors, could have been charged in a separate indictment. The charges against Timothy Rush in the superseding indictment were not significantly different from the charges in the original indictment; yet, the superseding indictment injected significantly more serious charges, including death-penalty eligible charges, against Gatling and Andre Rush. As a result, even though defendants had already filed and supplemented pretrial motions by the time the superseding indictment was filed in July 2015, they were forced to go back to the drawing board to review new discovery that, according to AUSA Hoag, was voluminous and covered a roughly twenty-year period.

The government's decision to attempt to place far greater restrictions on the disclosure of

materials related to the OPR and OIG investigations at a point when a protective order was already in place and had already been used to protect prior disclosures of OPR materials, further delayed this case. As the foregoing demonstrates, as a result of the government's failed attempt to place greater restrictions on the release of these documents, approximately three months elapsed between the time prosecutors disclosed the existence of additional OPR and OIG materials in November 2015 and the time they actually began making the disclosures in February 2016.

Finally, I acknowledge that delays related to the manner in which the OPR and OIG documents were released appear to have been inevitable given the fact that the investigation was active, ongoing, and evolving, and given the sensitive nature of the information and the needs of the investigative team. However, the defendants in this case had no control over that review and disclosure process. Instead, decisions regarding the appropriate process and procedures for reviewing and disclosing OPR and OIG materials were made solely by government actors. As such, for the purposes of this due process analysis, any delays resulting from those choices made by the government must be attributed to the government.

In sum, for all of the foregoing reasons, I find that strategic choices made by the government as well as issues with access to discovery at the jails resulted in significant delays of 12 months or more. Because the record before this Court demonstrates that the government was responsible for significant delay, due process requires that Timothy Rush be released unless special circumstances indicate that his release would pose an extraordinary threat to the government's regulatory interests in pretrial detention. *See Briggs,* 697 F.3d at 101.

C. **The Magnitude of the Threat Pretrial Release Poses to the Government's Regulatory Interests in Pretrial Detention.**

In determining whether the magnitude of the threat pretrial release poses to the government's regulatory interests in pretrial detention warrants continued detention, like other courts that have wrestled with this issue, I begin the analysis by considering the three regulatory interests *Salerno* held are served by pretrial detention:

> (1) protecting the integrity of the trial process (by, for example, preventing a defendant from attempting to intimidate witnesses, jurors, or others involved in the prosecution), (2) preventing danger to the community, and (3) assuring that the defendant is present for trial, and if convicted, for sentencing (the risk of flight factor).

*Aileman,* 165 F.R.D. at 595.

When, as in this case, the expected lenght of detention is great; the government is responsible for signficant delay; and there is little or no evidence that, with appropriate conditions, defendant's release would pose an "extraodinary threat" to the government's above-referenced interests in pretrial detention, due process requires the defendant be released even if the court has concluded that detention is warranted under the Bail Reform Act. *See Gonzalez Claudio,* 806 F.2d at 343 (though upholding the trial court's finding that no conditions of release will reasonably assure the appearance of defendants at trial, the court was "entitled to apply a broader standard of review in determining the extent to which the facts regarding risk of flight, as found by the District Court, have significance on the constitutional issue of whether continued detention violates due process limitations" and order defendant's release on restrictive conditions); *Aileman,* 165 F.R.D. at 596 (defendant ordered released on due process grounds where there was no evidence that he threatened witnesses or intended to take any other action that would jeopardize the integrity of the trial and any risk of harm to the community by continued drug trafficking could be reduced with restrictive conditions); *Hofstetter,* 2017 WL

4079181, at *10 (ordering release to strict conditions because, even though evidence in support of pretrial detention weighed against finding a due process violation, government did not demonstrate that release on strict conditions would pose an "extraodinary threat" either to the safety of the community or defendant's presence at trial).

Here, the government has failed to demonstrate that releasing Timothy Rush to restrictive conditions would pose an "extraodinary threat" to the government's interests in pretrial detention. First, there is no evidence that releasing Rush would pose an "extraodinary threat" to the government's interest in protecting the integrity of the trial process. As discussed in the Bail Reform Act section above, there is no evidence that Rush has, either on his own or at the direction of Gatling or anyone else, perpetrated any acts of violence against a witness, victim, or suspected informant in connection with this case, and there is no evidence that Rush had any involvement in the murder of his alleged co-conspirator Morgan. So, while there is evidence to suggest that co-defendants Gatling and Andre Rush may have threatened witnesses and/or suspected cooperators, there is no evidence to suggest that either Timothy Rush or co-defendant Gibbs engaged in any such conduct.

This is significant particularly because Gibbs, who has been charged with offenses identical to the offenses Rush is charged with, has been on pretrial release, without significant violations, for the entire 44 months that Rush has been detained. To be sure, it was Rush's criminal history, which is considerably more significant than Gibbs', that tipped the scales in favor of pretrial detention. However, notwithstanding Rush's criminal history, there is little evidence to support a finding that Rush's release to restrictive conditions would pose an "extraodinary threat" to the government's two other interests in pretrial detention—risk to the community and defendant's appearance at trial.

More specifically, the evidence in this case demonstrates that the primary risk to the safety of the community posed by Rush's release is the risk that he will engage in drug use and/or drug trafficking activities. However, evidence that Rush is currently sober due to his years of pretrial incarceration; evidence that Rush's role in the DEA's reverse sting operations was limited to that of driver; evidence that Rush had no weapons at the time of the sting operations; and the lack of any evidence of violence perpetrated by Rush in the furtherance of drug trafficking activities all tend to suggest that restrictive conditions such home incarceration (24 hours a day) with GPS location monitoring and restricted and/or monitored communications (other than those with counsel), along with other appropriate restrictions, would reasonably assure the safety of the community. Other than evidence remote in time that Rush historically has absconded supervision, there is little evidence to suggest that his release to restrictive conditions, such as those previously mentioned, would pose an "extraordinary threat" to the government's interest in his appearance at trial.

In sum, based on the record as a whole, I find that given the anticipated length of detention in this case and the government's responsibility for at least some of the delay, it would violate due process to continue detaining Timothy Rush because, with appropriate restrictive conditions, Rush's release would not pose an extraordinary threat the government's interests in pretrial detention.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Timothy Rush's Second Motion to Reconsider detention and for release pending trial (Doc. 468) is **GRANTED, in part, and DENIED, in part.** The motion is granted in that the Court has reconsidered the Defendant's detention under the Bail Reform Act. The motion is denied, in part, in that, after considering

evidence not previously presented, the Court concludes that the Bail Reform Act does not require defendant's pretrial release. The motion is also granted in that the Court has reconsidered Defendant's detention in light of the due process challenge and finds that Defendant's continued detention would violate due process.

**IT IS HEREBY RECOMMENDED** that Defendant Timothy Rush be released pending trial on conditions to be set by the undersigned United States Magistrate Judge on grounds that Defendant's continued detention pending trial would violate due process.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of December, 2017.