UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CR88RWS(SPM) |
| | ) | |
| DIONNE LAMONT GATLING-1, | ) | |
| TIMOTHY LAMONT RUSH-2, | ) | |
| ANDRE ALPHONSO RUSH-3, | ) | |
| LORENZO RALPH GIBBS-4, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendants' Amended Joint Motion and Memorandum to Suppress Wiretap Evidence Following *Franks* Hearing. Docs. 402, 454 & 459 be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

**IT IS HEREBY ORDERED** that there will be a Case Status Hearing at **10:00 a.m.** on **January 22, 2018** in Courtroom 13 South. At the hearing, the parties must be prepared to discuss what, if any, additional pretrial motions are anticipated and to propose deadlines for filing the same. Only counsel need attend the hearing.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of January 2018.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CR88RWS(SPM) |
| | ) | |
| DIONNE LAMONT GATLING-1, | ) | |
| TIMOTHY LAMONT RUSH-2, | ) | |
| ANDRE ALPHONSO RUSH-3, | ) | |
| LORENZO RALPH GIBBS-4, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

This matter was referred to the undersigned United States Magistrate Judge for all pretrial

matters pursuant to 28 U.S.C. §636(b). Currently pending before the Court is Defendants' Amended

Joint Motion and Memorandum to Suppress Wiretap Evidence Following *Franks* Hearing. Docs. 402,

454 & 459. Defendants contend evidence resulting from court-authorized wire interceptions should be

suppressed first, because under the rationale of *Franks v. Delaware,* 438 U.S. 154 (1978), the affidavit

submitted in support of the initial application for wiretap authorization contained false information and

omitted material information that, once stricken and/or considered, deprives the warrant application of

probable cause. Defendants' second ground for suppression is that the affidavit submitted in support of

the wiretap authorization failed to satisfy the necessity requirement set out in 18 U.S.C. §§2518(1)(c) &

(3)(c).

Defendants challenged the validity of the wiretap affidavit under *Franks* after learning that a

DEA Atlanta Group Supervisor, Keith Cromer, and one or more of his direct reports were being

investigated by the Office of Professional Responsibility ("OPR") and the Office of Inspector General

("OIG") for, among other things, an allegedly inappropriate relationship between Agent Cromer and a

1

confidential source, improper payments to the confidential source, and falsified reports to justify improper payments. Based on what was known about the investigation at the time, the United States conceded that defendants were entitled to a *Franks* hearing and agreed to disclose materials related to the investigation to defense counsel. *See* Doc. 139.

The *Franks* hearing began on October 17, 2016 and continued daily until October 21, 2016. The hearing was recessed from October 21, 2016 until January 9, 2017, to permit time for the parties to obtain cell phone data and telephone records whose relevance became apparent during the course of the hearing. Testimony resumed on January 9th and 10th, and the hearing was recessed again until January 19th due to witness availability. The hearing concluded on February 14, 2017. After all evidence was submitted, the parties requested, and were granted, leave to file post-hearing briefs. After several requests for additional time were filed, and granted, the motion was fully briefed on September 21, 2017, and is now ready for a ruling.[1]

After carefully considering the parties' written submissions and all of the evidence presented during the evidentiary hearing, I make the following findings of fact and conclusions of law.

## I.    FACTUAL FINDINGS

### A.    *The Title III Warrant Affidavit & Order*

On August 28, 2012, Assistant United States Attorney Tiffany Becker appeared before United States District Judge Henry E. Autrey and made an amended application for interception of wire communications over the Sprint brand cellular telephone re-sold to Total Call Prepay bearing the telephone number (314) 598-2330, with Electronic Serial Number (ESN) 268435460003332743

---

[1] Issuance of this Report and Recommendation was delayed in part due to intervening motions filed by Defendants Gatling and Timothy Rush that raised due process challenges to their continued pretrial detention. I found that it was important to address the due process challenge first as it posited that defendants' continued detention violated due process. Although I issued a report and recommendation on Timothy Rush's motion on December 1, 2017, (Doc. 511), I decided to delay ruling on Defendant Gatling's motion as it required a closer review and analysis of the facts at issue in the *Franks* hearing.

(referred to in the applications, affidavits, and orders as Target Telephone #1). *See* Govt. Exh. M-1A. The application was accompanied by and referenced the affidavit of TFO Budds, which was also signed and sworn to before Judge Autrey on August 28, 2012 (the "Affidavit"). *See* Govt. Exh. M-1.

The facts that formed the basis for the wiretap authorization were set out in the Affidavit and can be roughly grouped into five categories. First, the Affidavit asserted facts regarding events on August 5, 2012, which triggered the investigation. Namely, the Affidavit asserted that on August 5, 2012, a confidential source being utilized by DEA Atlanta ("CS1") alerted DEA Atlanta Agents to a suspected drug transaction occurring in St. Louis between suspected source of supply, Fidel Suarez, and Defendant Dionne Gatling. Govt. Exh. M-1, ¶¶21-22. Specifically, CS1 advised DEA Atlanta Agents that he/she was contacted by Suarez, who said he had a truck in St. Louis for a suspected narcotics transaction with Gatling. *Id.* at ¶22. Suarez was having trouble reaching Gatling and asked CS1 for help. *Id.* In attempting to help Suarez get in contact with Gatling, CS1 had a flurry of calls with Gatling and Suarez. *Id.* CS1 was ultimately successful in connecting Suarez and Gatling, who was using the telephone that became the target of the wiretap. *See id.*

Second, the Affidavit asserted facts relating both to CS1's reliability as an informant and measures DEA St. Louis investigators took to corroborate information provided by CS1. As to CS1's reliability, the Affidavit attested that CS1 was cooperating with the DEA "for monetary gain," had "been shown to provide reliable information to DEA regarding a multitude of felonious activity," and had provided information that "resulted in the arrest of at least one individual and the seizure of drugs and U.S. currency. *Id.* at note 3. As for corroboration by DEA St. Louis, the Affidavit asserted that DEA St. Louis investigators corroborated information from CS1 by using toll analysis of devices used by CS1, Gatling, and Suarez on August 5, 2012, *see id.* at ¶¶ 16, 24, 26-30, court-authorized precision location information, *see id.* at ¶¶22, 30, past criminal investigations, *see id.* at ¶¶10, 11-13, 18-20, and

information from DEA Atlanta agents who monitored some, but not all, of the calls between Gatling, Suarez, and CS1 on August 5, 2012. S*ee id.* at ¶¶23-25.

Third, the Affidavit asserted facts related to a suspected drug distribution conspiracy between Demetrius Flenory, Dionne Gatling, and Fidel Suarez. *See id.* at ¶¶ 9-15. More specifically, the Affidavit asserted that Demetrius Flenory was the purported national leader of the Black Mafia Family ("BMF") Drug Trafficking Organization and had been sentenced to 30 years imprisonment for drug trafficking activities. *Id.* at ¶9. The Affidavit further asserted that, based on information previously known to DEA St. Louis, Dionne Gatling was a member of St. Louis BMF, was an associate of Flenory, had "substantial ties" to multiple BMF members, had been indicted in the Eastern District of Missouri on drug trafficking charges, and sentenced to 120 months incarceration for drug trafficking. *Id.* at ¶10. The Affidavit asserted that, based on information from CS1 and an independent investigation by DEA St. Louis agents, Suarez owned and operated a trucking company in California, and had been investigated and/or arrested without conviction for suspected drug trafficking in 2005 and 2009. *Id.* at ¶11-12. In addition, an independent investigation by DEA St. Louis agents revealed two large quantity drug seizures from a truck operated by Suarez's trucking company. *Id.* at ¶13. Finally, the Affidavit attested that, based on information CS1 provided to DEA Atlanta agents, Flenory and Suarez became associated while both were incarcerated and, for monetary gain, Flenory arranged, through CS1, for Suarez to provide cocaine in multiple kilogram quantities to Gatling. *See id.* at ¶¶13-15.

Fourth, the Affidavit asserted facts relating to contacts between CS1, Gatling, and Suarez in the year leading up to the events on August 5, 2012. *Id.* at ¶¶16-20.  Specifically, the Affidavit asserted that toll analysis of devices used by Suarez and Gatling indicated they had been talking regularly since

March 2012 and that Gatling began using the target telephone in February 2012.[2] *Id.* at ¶16. The Affidavit also asserted CS1 had contact with Suarez and Gatling and was aware that Suarez had been in contact with Gatling and traveled to St. Louis prior to August 2012, but CS1 was not involved in any drug transactions directly with Suarez and/or Gatling and CS1 did not participate in any early conversations between Suarez and Gatling; thus, CS1 could not relay the content of those earlier discussions. *Id.* at ¶¶16-17. According to the Affidavit, CS1 advised investigators of a trip Suarez took to St. Louis in July 2012. Suarez's presence in St. Louis in July 2012 was corroborated by an investigation of Suarez on July 23, 2012, independent of this case, in which DEA agents in St. Louis surveilled and questioned Suarez for suspicious conduct described in the Affidavit. *Id.* at ¶¶18-20.

Fifth, the Affidavit attested that a wiretap was necessary. Specifically, the Affidavit described various investigative tools that have been considered and/or used in the investigation to date, including physical surveillance, use of confidential informants, undercover officers, pen registers, telephone toll records analysis, witness interviews, search warrants and trash pulls, interviews with target witnesses and use of grand jury proceedings, review of police records, use of electronic surveillance cellular location data, tracking devices, and prior Title III intercepts. *See id.*, ¶¶31-57. The Affidavit recited in detail investigative tools used in the investigation and why each tool had not been successful or was unlikely to be successful. *Id.*

On August 28, 2012, Judge Autrey signed an Amended Order authorizing the interception of wire communications of Target Telephone #1. *See* Govt. Exh. M-1B. The Order states that the Court found probable cause to believe that the listed individuals were committing violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 848, and that communications concerning the offenses were likely to be

---

[2] At the evidentiary hearing, Agent Johnson acknowledged that the reference to February 2012 was a typographical error and that toll records showed that Gatling began using the target telephone in July 2012.

intercepted. The Order further found that normal investigative techniques had been tried and had faile;

reasonably appeared to be unlikely to succeed if tried; or were too dangerous to be employed. The order

authorized the wiretap interception for thirty (30) days. *See id.*

### B.  The OPR and OIG Investigations

Documents contained in the Court's electronic docket in this case reflect that on March 18, 2015,

former retained counsel for Gatling advised the government via email that CS1 had contacted one of his

associates claiming, among other things, that the wiretap affidavit was factually inaccurate. CS1 also

reportedly told the associate that the DEA agent in Atlanta, who was referenced in the affidavit, had

been suspended or was under investigation. Attorneys for the government apparently looked into the

allegations and advised the Court and defense counsel that the DEA Office of Professional

Responsibility ("OPR") was, in fact, investigating possible misconduct of one or more DEA agents who

provided material information to the investigation in this case, including DEA Atlanta Group Supervisor

Keith Cromer ("Agent Cromer").

At a hearing on April 27, 2015, the United States conceded on the record that, based on what was

known about the internal investigation, all defendants were entitled to a *Franks* hearing. The United

States further acknowledged that defense counsel were entitled to additional disclosures related to the

investigation pursuant to the government's obligations under *Brady, Bagley, and Giglio. See* Doc. 139.

Because defendants had already filed pretrial motions at the time of the hearing, defendants were

permitted to supplement their previously filed motions and to file any other substantive pretrial motions

that are unrelated to electronic surveillance evidence. *See id.*

At a status hearing on November 4, 2015, the United States disclosed that there was additional

information related to the internal OPR investigation as well as a criminal investigation by the Office of

the Inspector General ("OIG"), that had only recently been revealed to St. Louis prosecutors. *See* Doc.

208. Agent Cromer and some of his direct reports were targets of the OPR and OIG investigation, and documents from the investigation reflect that Agent Cromer contested the claimed misconduct. The United States produced OPR and OIG documents on a rolling basis to defense counsel between February 2016 and the early part of May 2016.

### C.  Evidence Presented at the Franks Hearing

At the evidentiary hearing, the United States presented testimony of six witnesses and documentary evidence regarding the veracity of the statements in the Affidavit. Specifically, the United States presented the testimony of CS1, [3] who testified about the events of August 5, 2012, and about the relationship between CS1, Demetrius Flenory, Dionne Gatling, and Fidel Suarez. Evid. Hrng. Tr. Vol. 1 (Doc. 406). The United States also presented testimony of retired DEA Atlanta Special Agent, Jack Harvey ("Agent Harvey"), who testified about how CS1 came to be a confidential source for the DEA, CS1's role while Agent Harvey was the controlling agent for CS1, and events leading up to the OPR and OIG investigations into Agent Cromer and others. *See* Evid. Hrng. Vol. 2 (Doc. 380), at 6-34 & Vol. 2 - Excerpt (Doc. 407). DEA Atlanta Special Agent James Davidson ("Agent Davidson") testified about threats directed to CS1 in the Spring of 2015 after electronically filed court documents in this case became publicly available. S*ee* Evid. Hrng. Vol. 2 (Doc. 380), at 35-68. Finally, the United States presented testimony of DEA St. Louis Agents who had responsibility for preparing the Affidavit: Taskforce Officer Robert Lang ("TFO Lang"), *see id.*, pp. 71-137; Evid. Hrng. Vol. 3 (Doc. 382), at 24-64 & Evid. Hrng. Vol. 3-Excerpt (Doc. 408), at 14-18; Special Agent Brett Johnson ("Agent Johnson"), *see* Evid. Hrng. Vol. 3 (Doc. 382), at 66-234, Evid. Hrng. Vol. 3-Excerpt (Doc. 408), at 19-31 & Evid. Hrng. Vol. 7 (Doc. 428), at 63-209; and Taskforce Officer Patrick Budds ("TFO Budds"), *see* Evid.

---

[3] At the start of the evidentiary hearing, CS1's identity was established on the record in closed court. For CS1's safety, that portion of the record was sealed and the Court admonished counsel and all of the witnesses to refer to CS1 as CS1 throughout the *Franks* hearing.

Hrng. Vol. 4 (Doc. 384), at 23-87 & Evid. Hrng. Vol. 4-Excerpt (Doc. 409).

Defendants presented testimony of seven witnesses and documentary evidence regarding the veracity of the statements in the Affidavit, the relationship between CS1 and Agent Cromer, payments made to CS1 by, or at the direction of, Agent Cromer, and CS1's contribution, or lack of contribution, to investigations for which CS1 received a form of compensation. Specifically, in addition to cross examining the United States' witnesses regarding statements in the Affidavit, defendants presented testimony of Agent Cromer, *see* Evid. Hrng. Vol. 3- Excerpt (Doc. 408), at 5-10, Evid. Hrng. Vol. 5-Excerpt (Doc. 411), Evid. Hrng. Vol. 5 (Doc. 410) & Evid. Hrng. Vol. 6 (Doc. 427), at 15-184,[4] and the following former direct reports of Agent Cromer: DEA Atlanta Task Force Officer David Aguilar ("TFO Aguilar"), *see* Evid. Hrng. Vol. 3-Excerpt (Doc. 408), at 11-13; DEA Atlanta Task Force Officer Frederick Swoope ("TFO Swoope"), *see* Evid. Hrng. Vol. 6 (Doc. 427), at 186-187; and former DEA Atlanta Taskforce Officer Anthony Smith ("TFO Smith"), *see* Evid. Hrng. Vol. 8 (Doc. 430), at 24-26, Vol. 9 (Doc. 443) & Evid. Hrng. Vol. 9-Excerpt (ECF 444).[5]

Defendants also presented testimony of DEA Atlanta Special Agent Mara Hewitt ("Agent Hewitt"), who was the case agent on an investigation for which CS1 received compensation, but according to Agent Hewitt, provided no known information of value, *see* Evid. Hrng. Tr. Vol. 7 (Doc. 428), at 5-17 & Evid. Hrng. Tr. Vol. 7-Excerpt (Doc. 441), at 4-6; and DEA Atlanta Taskforce Officer Tyler Hooks ("TFO Hooks"), who was also involved in the same investigation with Agent Hewitt, *see* Evid. Hrng. Tr. Vol. 8 (Doc. 430), at 6-22. Finally, defendants presented deposition testimony of CS2 and testimony of Agent Cromer's former supervisor, retired DEA Atlanta Special Agent John Murphy

---

[4] Agent Cromer initially invoked his Fifth Amendment right against self-incrimination but subsequently waived his right by providing substantive answers to questions posed by defense counsel.

[5] TFOs Aguilar and Swoope respectively asserted their Fifth Amendment right against self-incrimination; thus, they did not provide any substantive testimony. Although TFO Smith initially indicated that he intended to invoke his Fifth Amendment right against self-incrimination, he waived his Fifth Amendment right by providing substantive answers to questions posed by defense counsel.

("Agent Murphy"), who testified about DEA policies and procedures surrounding payment of confidential informants and Agent Murphy's involvement in the events leading up to the OPR and OIG investigations of Agent Cromer. *See* Evid. Hrng. Tr. Vol 7 (Doc. 428), at 19-59.[6]

Based on my observation of the witnesses during the hearing, I found all of the witnesses presented by the United States to be credible witnesses with the exception of CS1, whose testimony was not entirely credible for reasons addressed more fully below. I similarly found the defense witnesses to be credible, although their testimony was not always directly relevant to the narrow issues before the Court. To the extent a defense witness's testimony was not fully credible, I have noted that below.

### 1. CS1

CS1 first became a confidential informant for DEA Atlanta in 2009 when he/she provided information in a money laundering case which resulted in the successful prosecution and conviction of an individual named Terry White. Evid. Hrng. Tr. Vol. 1 (Doc. 406), at p. 53-55; Evid. Hrng. Tr. Vol. 2 (Doc. 380), pp. 9-15.[7] Although CS1 was not initially a paid DEA informant, CS1's controlling agent, Agent Harvey, put CS1 in for an award that would be a percentage of the value of property forfeited by White because information provided by CS1 was so beneficial that the DEA made seizures from White. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at pp. 11-13.[8]

After Agent Harvey retired in 2011, CS1 became a paid DEA informant under the supervision of

---

[6] For the safety of CS2, CS2 was identified at sidebar during the testimony of Agent Hewitt and TFO Hooks. That portion of Agent Hewitt's testimony is sealed.

[7] According to Agent Harvey, CS1 was the "heart and soul" of the Terry White case. Evid. Hrng. Tr. Vol. 2 (Doc. 380), at p. 9. Agent Harvey testified that CS1 was an unusual informant in that he/she had no criminal record, was not a known drug user, did not appear to be motivated by money, and was not looking to get a reduced prison sentence or dismissal of criminal charges. *Id.* at 11. Rather, CS1 appeared to be motivated to make up for the fact that White had used CS1 to unwittingly launder drug money. *Id.* at 10. CS1 provided significant information during the investigation of the case which was used in various search warrants. The investigation, which started in 2008, culminated with an arrest in 2009, and White was convicted and sentenced in 2011. *Id.* at 9-15.

[8] CS1 eventually received an award of approximately $55,000 for the Terry White case. Evid. Hrng. Vol. 1, (ECF 406), at pp. 78-79.

9

TFO Fred Swoope and TFO Swoope's supervisor, DEA Atlanta Group Supervisor Keith Cromer. *See* Evid. Hrng. Tr. Vol. 2 (ECF 380), at pp. 15-16; Evid. Hrng. Vol. 1, (ECF 406), at p. 77. Although the precise scope of CS1's duties after Agent Harvey's retirement is not entirely clear, CS1 testified, credibly, that he/she was paid on a monthly basis for things like picking up money or drugs and/or making phone calls in drug investigations. Evid. Hrng. Vol. 1, (ECF 406), at p. 55-57, 76. According to the testimony of Agent Cromer, CS1 was paid on a monthly basis for providing "actionable" information—i.e., information that could lead investigators to a drug source of supply—in ongoing long-term drug investigations. *See also* Evid. Hrng. Tr. Vol. 6 (Doc. 427), at pp. 26-29. For example, according to Agent Cromer, information from CS1 that Fidel Suarez, a California-based Mexican national known to law enforcement to be a suspected drug distributor, and Gatling or "Cuff," were conspiring to engage in drug trafficking activity was the sort of actionable information for which CS1 might receive payment. *See, id.,* at p. 29; *see also* Evid. Hrng. Tr. Vol. 9 (Doc. 443), pp. 33-43 (cross examination of TFO Smith) & Govt. Exhs. 48, 48-A, & 48-B. [9]

Sometime after CS1 became a paid DEA informant, in violation of DEA policy, CS1 and Agent Cromer developed an intimate, personal relationship. Specifically, according to CS1, CS1 and Agent Cromer developed a relationship that started as a friendship and evolved into a sexual relationship that lasted through 2012. Evid. Hrng. Vol. 1, (Doc. 406), at 59. Agent Cromer admitted that his relationship with CS1 became personal in violation of DEA policy but denied that it was ever sexual in nature. Evid. Hrng. Vol. 5 (Doc. 410), at 70-71 & 73.[10] There is no evidence that either the St. Louis agents who prepared the Affidavit or the Atlanta agents who worked with Agent Cromer and CS1 were aware of

---

[9] Indeed, although TFO Smith raised questions about the propriety of the amount of payments made to CS1, *see infra,* at p. 11, he testified that CS1 "provided a multitude of information on felonious activity." Evid. Hrng. Tr. Vol. 9 (Doc. 443), at 12.

[10] This aspect of Agent Cromer's testimony is not entirely credible in light of CS1's testimony, Agent Cromer's admission that he and CS1 took trips together, and intimate photographs of Agent Cromer extracted from CS1's cell phone.

their relationship.

Although Agent Cromer testified that all of the payments made to CS1 during his/her tenure as a paid informant were proper, testimony of Agent Murphy and TFO Smith, as well as Agent Harvey, called into question the propriety, under DEA policy, of Agent Cromer's authorization of payments to CS1 on a nearly monthly basis. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 407), at 41-45 (testimony of Agent Harvey); Evid. Hrng. Tr. Vol. 7 (Doc. 428), at 27-29, 50-59 (testimony of Agent Murphy); Evid. Hrng. Tr. Vol. 9 (Doc. 443), at pp. 9-11 (testimony of TFO Smith). In addition, testimony by Agent Hewitt and TFO Hooks suggested that CS1 may have inappropriately received an award for an investigation for which CS2 actually provided actionable information. *See* Evid. Hrng. Tr. Vol. 7 (Doc. 428), at 5-17 & Evid. Hrng. Vol. 7-Excerpt (Doc. 441), at 4-6 (testimony of Agent Hewitt); Evid. Hrng. Tr. Vol. 8 (Doc. 430), at 6-22 (testimony of TFO Smith). However, there was no evidence presented to suggest that CS1 lacked personal knowledge of the information incorporated into the Affidavit at issue in this case and/or that, in providing information to agents, CS1 was somehow taking credit for information known by another informant.

### 2. *CS1's Relationship With Flenory, Suarez, and Gatling*

When CS1 became a DEA informant, CS1 was, and had been, a long-time friend and associate of Demetrius Flenory. *See* Evid. Hrng, Tr. Vol. 1 (Doc. 406), pp. 58-59. Specifically, CS1 held Flenory's power of attorney and "life rights with creative control"—i.e., the right to tell, and presumably sell, Flenory's life story for profit. *See* Evid. Hrng, Tr. Vol. 1 (Doc. 406), p. 59 & 106-107. Those rights, by CS1's estimation, could be worth as much as $1 million. *Id.* at 213. Both Agent Harvey and Agent Cromer were aware of CS1's relationship with Flenory. *See id.* at p. 59; *see also* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at pp. 14-15 (testimony of Agent Harvey).

CS1 testified that Flenory was very well known, and it was not at all unusual for CS1 to receive

11

calls from total strangers asking about Flenory. Evid. Hrng, Tr. Vol. 1 (Doc. 406), p. 61. It was due to CS1's relationship with Flenory that CS1 first came in contact with both Fidel Suarez and Dionne Gatling. *Id.* at pp. 60-63.

In September 2011, Flenory requested CS1's help coordinating delivery of a load of cocaine to be controlled by Suarez who, at that point, was already in contact with CS1. *See* Evid. Hrng. Tr. Vol. 9 (Doc. 443), pp. 33-43 & Govt. Exh. 48. CS1 credibly testified that he/she first met Suarez by telephone when Suarez contacted CS1 to ask how Flenory was doing. Evid. Hrng. Vol. 1 (Doc. 406), p. 62. Flenory confirmed that he and Suarez were friends and that they had met in the county jail in Michigan. *Id.* Although CS1 did not meet Suarez in person, he/she spoke with Suarez by phone and text; additionally, Suarez sent CS1 a picture of himself. *Id.* at 67-68. Sometime in 2012, Suarez asked CS1 if he/she knew someone who might want to buy some pills. *Id.* at 63. According to CS1, he/she was in a car with Agent Cromer during this first narcotic-related conversation with Suarez. *Id.* Agent Cromer overheard the call and signaled to CS1 to say "yes," he/she knew someone. *Id.* CS1 was later contacted by an agent in California regarding Suarez. *Id.*[11]

As with Suarez, Defendant Gatling first contacted CS1 to see how Flenory was doing in jail. *Id.* at 60. Based on discussions with both Gatling and Flenory, CS1 understood that Gatling and Flenory were friends. *Id.* Initially, CS1's relationship with Gatling was more of a business relationship and communications centered more around Flenory's life rights. *Id.* at 61. However, at some point, Flenory asked CS1 to connect Gatling and Suarez, and the relationship between CS1, Gatling, and Suarez turned

---

[11] As set out above, CS1 and Agent Cromer developed an intimate, personal relationship that violated DEA policy. The existence of this personal relationship helps to explain why, on occasion, Agent Cromer was physically present when CS1 communicated with Suarez and perhaps others who may have been targets of an investigation.

to narcotics. *Id.* at 60-63.

Telephone toll records reflect that Suarez and Gatling were in contact with each other on various devices from as early as March 2012 through August 2012. *See* Evid. Hrng. Tr. Vol. 3 (Doc. 383), at pp. 97-100 & Govt. Exh. M-14. Although telephone toll records show that during the same time period, Suarez and, with less frequency, Gatling were in contact with CS1, there is no evidence to suggest that CS1 participated in any of the early telephone calls between Suarez and Gatling. In July 2012, Suarez invited CS1 to join him on a trip to St. Louis, without stating why he was going to St. Louis. CS1 declined. Evid. Hrng. Vol. 1 (Doc. 406), at 64. Telephone toll records reflect that Suarez contacted CS1 while he (Suarez) was in St. Louis. *See* Govt. Exh. M-15.

At the evidentiary hearing, CS1 denied that Flenory had any involvement in any drug trafficking activities between Suarez and Gatling and denied that CS1 ever informed DEA agents that Flenory was so involved. Evid. Hrng. Vol. 1 (Doc. 406), at 188, 189, 194, 196 & 210. CS1 also denied that he/she ever informed DEA agents that Flenory directed CS1 to connect Gatling and Suarez. *See id.* However, this aspect of CS1's testimony is not credible for at least three reasons. First, CS1's testimony conflicts with the testimony of TFO Lang, the DEA St. Louis agent who interviewed CS1 about the events of August 5th. TFO Lang credibly testified that during his debrief of CS1 on August 6, 2012, CS1 told him that CS1 had facilitated the introduction of Gatling and Suarez at Flenory's request. Evid Hrng. Tr. Vol. 2 (Doc. 380), at 81-82. Second, CS1's testimony also conflicts with the contemporaneous 2011 interview notes of DEA Atlanta investigator TFO Smith, which were introduced into evidence. *See* Govt. Ex. 48. Those notes are consistent with assertions in the Affidavit regarding Flenory's involvement in the suspected drug conspiracy. Finally, evidence presented at the hearing demonstrated that CS1 faced actual and perceived threats when court filings in this case revealed CS1's identity.

Specifically, on February 6, 2015, all defendants in this case filed pretrial motions, including

separate motions to suppress wiretap evidence. In March 2015, CS1 reviewed the electronic docket in this case and saw information contained in Defendant Gatling's suppression motion and responsive submissions by the United States that CS1 believed would potentially allow people familiar with the circumstances to determine CS1's identity.[12] Upon reviewing the court filings in this case, CS1 contacted his/her controlling DEA Agent at the time, James Davidson. Agent Davidson testified at the evidentiary hearing that CS1expressed concern that motions filed in this case, and the government's response to those motions, contained specific detailed information that CS1 feared would reveal his/her identity or make it much easier for someone to figure out CS1's identity. Evid. Hrng. Vol. 2 (Doc. 380), at 37-38. CS1 panicked and took several measures to try to protect his/herself.

Those measures included contacting the undersigned Magistrate Judge, whose chambers referred CS1 to the United States Attorneys' Office, *id*. at 39-42; and driving several hours to Louisiana soon after learning about the court filing to attempt to see Flenory to try to explain his/her position and try to deflect any accusations coming CS1's way. *Id.* Although it appears that CS1 did not speak with Flenory in Louisiana on March 6th, CS1's hearing testimony suggests that, when CS1 did finally speak with Flenory, he advised CS1 he "didn't want his name caught up in this mess." Evid. Hrng. Vol. 1 (Doc. 406), at 207. In addition to CS1's perception that he/she was in danger because of the revelations, Agent Davidson credibly testified that CS1 faced actual threats in the weeks and months following the court filings in March 2015, through the time of the *Franks* hearing. Evid. Hrng. Vol. 2, at 42-52.

In a further attempt to protect him/herself in the Spring of 2015, CS1 stated in a draft affidavit that the wiretap Affidavit contained false information and outlined a different version of events from what is set out in the Affidavit. *See* Evid. Hrng. Tr. Vol. 1, p. 126-27 & Deft. Exh. F. CS1 never signed the draft affidavit or swore to it but CS1 relayed some of the information in the unsworn affidavit to

---

[12] The documents were not filed under seal and have since been ordered sealed.

Gatling's former counsel, DEA agents, and prosecutors from the US Attorney's Office in St. Louis. *See* Evid. Hrng. Tr. Vol. 1, p. at p. 80-85. CS1 also threatened to circulate the unsworn affidavit to all parties involved, including the undersigned. *See id.* CS1's unsworn affidavit specifically takes issue with statements in the wiretap affidavit suggesting that Flenory, "hooked up" the deal between Gatling and Suarez. *See* Deft. Exh. F at p. 2. The unsworn affidavit suggests instead that Agent Cromer implicated Flenory because he was jealous of Flenory's relationship with CS1. *Id.*

This backdrop of actual and perceived threats to CS1 diminishes the credibility of CS1's testimony and instead very strongly suggests that, perhaps due to CS1's personal and business relationship, as well as out of concerns for his/her own safety and the safety of Flenory, CS1 had an incentive to attempt to distance Flenory from Suarez and Gatling. [13]

### 3. August 5, 2012

On Sunday, August 5, 2012, at approximately 11 AM (ET), Suarez began contacting CS1 using two different telephone numbers. He sent CS1 text messages from telephone number (213) 260-2841, and placed voice calls to CS1 from telephone number (323) 412-6591. Specifically, around 11 AM Suarez sent CS1 a text message asking CS1 to call "Cuff" a/k/a Gatling and tell Gatling to give Suarez a number so that Suarez could talk to him. *See* Govt. Exh. M-52; *see also* Testimony of Agent Johnson, Evid. Hrng. Tr. Vol. 7 (ECF. Doc. 428), pp. 76-82. CS1 responded shortly thereafter indicating he/she would do so when he/she got home. *See id.* A little more than an hour later, at approximately 12:18 PM, Suarez placed a voice call to CS1; and, when he did not reach CS1, he sent a text message indicating he was trying to call and asking CS1 to pick up. *See* Govt. Exhs. M-50A & M-52. *See also* Evid. Hrng. Tr. Vol. 7 (Doc. 428), pp. 76-82 (testimony of Agent Johnson). In an apparent response to Suarez's request,

---

[13] CS1 apparently reiterated these concerns to Agent Harvey when Agent Harvey met with CS1 in March of 2015. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at 18-20; *See* Evid. Hrng. Tr. Vol. 2-Excerpt (Doc. 407), at 31-33.

CS1 placed a call to Dionne Gatling at approximately 12:43 PM, but did not reach him. *See* Govt. Exh. M-50A & M-56B, at p. 25.

Suarez's desire to connect with Gatling (and CS1) on August 5, 2012, appears to have been a matter of some urgency. Between 12:18 and 1:05 PM, Suarez placed fourteen calls to CS1 and sent a text asking if CS1 was "still busy." *See* Govt. Exhs. M-50A, M-52B & M-56B, at p. 24-25. It appears from toll and telephone records that at approximately 1:05 PM, Suarez finally connected with CS1 by telephone and spoke with CS1 for approximately 1:35 minutes. *See id.* Although it does not appear that Suarez actually spoke with CS1 prior to the call at 1:05 PM, it appears from the evidence of record that Suarez left one or more voicemails on CS1's phone, and that CS1 accessed those voicemails during the relevant time-frame on August 5th. *See* Govt. Exh. M-56B, at p. 24-25 & Evid. Hrng. Tr. Vol. 7 (Doc. 428), at p. 99-100 (testimony of Agent Johnson).

After speaking with Suarez at 1:05 PM, CS1 sent Agent Cromer a text message around 1:09 PM asking him to call back and indicating it was "just business." *See* Govt. Exhs. M-50A, M-52 & M-56B, at p. 25. At that time, Agent Cromer was returning by car from an out-of-town trip with his family, and did not immediately respond. Evid. Hrng. Tr. Vol. 5 (Doc. 410), at p. 96-98; Evid. Hrng. Tr. Vol. 6 (Doc. 427), at 140-142 & 168- 174 & Govt. Exhs. M-55 & M-50A. At 1:11 PM, Suarez sent CS1 a text with a phone number: 358-4269; fifteen minutes later, at 1:26 PM, Suarez texted again "[j]ust in case he wouldn't know it's 314," apparently referencing the area code to the 4269 number he had just texted. *See* Govt. Exh. 52. At 1:34 PM, Gatling, returned CS1's earlier call and left a voicemail. Govt. Exhs. M-50A, M-52 & M-53A.   At 2:06 PM, CS1 returned Gatling's call and spoke with Gatling for approximately 4:30 minutes. M-56B, at p. 26.

After the call with Gatling, CS1 once again called Agent Cromer, who finally called CS1 back around 2:17 PM. Govt. Exhs. M-50A & M-56B, at p. 26. Once CS1 made contact with Agent Cromer,

16

CS1 spoke with Agent Cromer for over seven minutes, presumably bringing him up to speed. *See* Govt. Exhs. M-54 & M-56B, at p. 26. Toll and telephone records establish that CS1 attempted to reach Gatling around 2:24 PM. *Id.* Around the same time, Gatling called CS1 using the telephone number that became the target of the wiretap: (314) 598-2330 (the "Target Telephone"); however, Gatling's call from the Target Telephone was routed to CS1's voicemail. *See id.* & Govt. Exh. M-53A. At approximately 2:24 PM, Gatling called CS1 using the Target Telephone and, unbeknownst to Gatling, CS1 added Agent Cromer to the call via three-way calling. *See* Govt. Exhs. M-54 & M-56B, at p. 26*. See also* Evid. Hrng. Tr. Vol. 7 (Doc. 428), at pp. 156-58 (testimony of Agent Johnson).

Around the time of the three-way call between CS1, Gatling, and Cromer, Suarez sent CS1 a text asking if Gatling had answered CS1. *See* Govt. Exh. M-52. At 2:30 PM, CS1 responded by text, stating, "[y]es he is trying to call u now and u are not picking up," to which Suarez responded, "[g]ive him that number I gave you . . . 314 358 4269 new number I lost the other phone." *Id.* CS1 contacted Agent Cromer immediately after receiving this information from Suarez and then, based on toll records, received a call from Gatling around 2:29 PM, during which CS1 provided Gatling with the new number from Suarez. *See* Govt. Exhs. M-19, at p. 293 (toll records reflecting a 10 minute call between Gatling and Suarez shortly after CS1 spoke with Gatling), M-50A & M-56B, at p. 26.

Although the telephone and toll records do not reflect the content of the discussions between CS1, Gatling, and Suarez, CS1 credibly testified that when he/she spoke with Suarez on August 5th, Suarez was upset or frustrated because he had been trying to reach Gatling without success. Evid. Hrng. Tr. Vol. 1 (Doc. 406), at p. 65. Suarez indicated in words or substance that he was trying to deliver a shipment of narcotics to Gatling. *Id.* He expressed a sense of urgency in contacting Gatling, indicating he had an "F'n truck up there" and suggested Gatling was "playing games." *Id.* Suarez asked CS1 to contact Gatling. *Id.* CS1 had an alternate number for Gatling and, as the toll and telephone records

17

discussed above clearly demonstrate, CS1 reached out to Gatling as Suarez requested. *Id.*

At the evidentiary hearing, CS1 testified that, contrary to statements in the Affidavit, Agent Cromer was physically present with CS1 in CS1's home during CS1's calls with Suarez and Gatling. Evid. Hrng. Tr. Vol. 1 (Doc. 406), at 65, 163-64. CS1 further testified that, because he was physically present, Agent Cromer overheard the content of the calls with Suarez and Gatling. *Id.* CS1 denied that Agent Cromer overheard any of the calls via a three-way call. *Id.* This aspect of CS1's testimony is entirely not credible in light of the other evidence of record. Specifically, Agent Cromer credibly testified that over the weekend of August 5th, he was in South Carolina on a family trip. Evid. Hrng. Tr. Vol. 5 (Doc. 410), at p. 96-98. Agent Cromer's credit card records, which were retrieved during the hearing, corroborated his testimony as did the aforementioned toll records. The toll records reflect that CS1 sent text messages and placed telephone calls to Agent Cromer after first receiving the call from Suarez on August 5th, and reflect that Agent Cromer participated in at least one three-way call with CS1 and Gatling.  *See id.; see also* Evid. Hrng. Tr. Vol. 6 (Doc. 427), at 141-143, 168-170 & Deft. Gibbs Exh. 5, Govt. Exh. M-55.

Agent Cromer testified that the statements in the Affidavit recounting the events of August 5th were true, including statements that he overheard the conversation between CS1 and Suarez about the truck. Evid. Hrng. Tr. Vol. 6 (Doc. 427), at 174-179. However, it was clear from observing his testimony that Agent Cromer was unable to independently recall with any specificity the content of the discussions between CS1, Suarez, and Gatling on August 5, 2012. *See id.*; *see also*  Evid. Hrng. Tr. Vol. 5 (Doc. 410), at 95-101. Nor could he could he recall whether he overheard live discussions between CS1 and Suarez and/or Gatling or if he overheard recorded voicemail messages played back by CS1. Evid. Hrng. Tr. Vol. 6 (Doc. 427), at 174. As set out above, telephone records demonstrate that Agent Cromer overheard one conversation between CS1 and Gatling via a three-way call but there is no

evidence of a similar three-way call between Agent Cromer, CS1, and Suarez. Although it is not entirely clear *how* Agent Cromer learned that Suarez told CS1 he "had an 'f'n truck' in St. Louis" and was trying to reach Gatling, the credible evidence of record suggests that Agent Cromer either "overheard" Suarez make that statement when CS1 played back a recorded voicemail from Suarez or he "overheard" Saurez's statement because CS1 repeated it to Gatling while Agent Cromer was listening in to the three-way call between Gatling, CS1, and Agent Cromer.

Regardless of *how* he learned of the content of CS1's discussion with Suarez, Agent Cromer relayed the content of that discussion to DEA St. Louis agents at or near the time these events were unfolding. Telephone toll records reflect that, beginning around 3:48 PM on August 5th, Agent Cromer made multiple calls to a DEA St. Louis desk agent and to DEA St. Louis Group Supervisor Kevin Merkel. *See* Govt. Exh. M-54; Evid. Hrng. Tr. Vol. 6 (Doc. 427), pp. 172-175 (testimony by Agent Cromer). In addition, testimony by Agent Johnson and TFO Lang established that on Sunday, August 5, 2012, the DEA St. Louis office received notice from DEA Atlanta that an individual named Fidel Suarez had a truck believed to contain a shipment of narcotics in St. Louis destined for an individual known only to the DEA Atlanta office as "Cuff." *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at pp. 77-78 (testimony of TFO Lang); Evid. Hrng. Tr. Vol. 3 (Doc. 382), at pp. 72-73 (testimony of Agent Johnson).

Because DEA St. Louis was already very familiar with the name "Cuff" as an alias or nickname of Defendant Dionne Gatling, *see* Doc. 380, at pp. 82-83; Doc. 382, at pp. 75-84, DEA St. Louis Group Supervisor Kevin Merkel assembled a team of investigators, which included Agent Johnson and TFOs Lang and Budds, to follow up on the information received from DEA Atlanta. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at pp. 77-78 (testimony of TFO Lang); Evid. Hrng. Tr. Vol. 3 (Doc. 382), at 72-73 (testimony of Agent Johnson).

### 4. *Follow-up investigation by DEA St. Louis*

On August 6, 2012, the St. Louis investigative team, which included Agent Johnson, TFO Lang, and TFO Budds, spoke with Agent Cromer and perhaps other agents in Atlanta on a conference call. *Id.* Agent Cromer advised the St. Louis team of investigators that, on August 5th, a DEA confidential source ("CS1") had been contacted by Fidel Suarez, a suspected drug transporter or source of supply. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at 78-79. Agent Cromer advised the St. Louis investigators that, in attempting to put Gatling and Suarez in contact with each other, there had been a flurry of phone calls between CS1, Suarez, and Gatling. *Id.* The DEA St. Louis agents obtained Agent Cromer's permission to contact CS1 directly. *Id.*

Following this initial call with Agent Cromer, the St. Louis investigative team decided to pursue the investigation. As such, TFO Lang continued the background investigation by conducting an interview of CS1 later on August 6, 2012. *Id.* at p. 80. TFO Budds also pursued additional background information on August 6th by conducting physical surveillance of Gatling and conducting a trash pull, which yielded nothing of evidentiary value.  Evid. Hrng. Tr. Vol. 4 (Doc. 384), at 28-29, 48.

In debriefing CS1 on the evening of August 6, 2012, TFO Lang confirmed what had been reported by Agent Cromer and incorporated into the Affidavit regarding the events of August 5th. *See* Evid. Hrng. Tr. Vol. 2 (Doc. 380), at 80-86. CS1 also provided TFO Lang with three different telephone numbers for each individual used during on August 5, 2012, including Target Telephone 1, the subject of the wiretap authorization. *Id.* at 85-86. CS1 also elaborated on the flurry of telephone calls with Suarez and Gatling. *Id.*

When TFO Lang asked CS1 about the relationship between Suarez and Gatling, CS1 told TFO Lang that CS1 had facilitated the introduction of Suarez and Gatling at Flenory's request for the purpose of Suarez supplying Gatling with multi-kilogram quantities of cocaine. *Id.* at 81-82. CS1 told TFO Lang that Suarez and Flenory had met while both were incarcerated in the Detroit, Michigan area in 2005, and

that Flenory was going to receive some sort of financial benefit based on the drug trafficking relationship between Suarez and Gatling. *Id.* at 82-83. CS1 told TFO Lang CS1 had never met either Suarez or Gatling but advised of telephone and/or text contact with both. *Id.* at 82. CS1 informed TFO Lang of at least one instance CS1 was aware of when Suarez visited St. Louis, which would have been in July 2012. *Id.* at 84. CS1 was aware of the visit because Suarez called CS1 and invited CS1 to meet him in St. Louis, but CS1 declined the invitation. *Id.*

Due to the St. Louis investigative team's knowledge and experience with Gatling as a sophisticated large-quantity drug distributor and due to the team's knowledge of Suarez as a California-based large-scale drug distributor or source of supply, the team decided to pursue a Title III investigation. Evid. Hrng. Tr. Vol. 3 (Doc. 382), at 69; Evid. Hrng. Tr. Vol. 7 (Doc. 428), at 124-126 (testimony of Agent Johnson). At that point, different people within the group were tasked with different responsibilities, but the team worked collaboratively in conducting the investigation and incorporating their findings into the Affidavit. Evid. Hrng. Tr. Vol. 3 (Doc. 382), at 69.

As the most experienced member of the team, Agent Johnson was tasked with drafting the Affidavit and analyzing telephone toll records of telephones used by Gatling and Suarez. *See Id.*, at 66-67, 69-70.[14] TFO Lang was tasked with investigating the individuals involved to learn more information about them, including researching DEA indices for criminal records and other criminal investigations. Evid. Hrng. Tr. Vol. 2 (Doc. 380), at 87. TFO Budds was tasked with surveillance and locating historical information on the subjects of the investigation. *See* Evid. Hrng. Tr. Vol. 4 (Doc. 384), at 27.

Agent Johnson's analysis of telephone records and telephone toll analysis corroborated information provided by CS1. Evid. Hrng. Tr. Vol. 3 (Doc. 382), at 86. For instance, telephone toll records demonstrated that, consistent with CS1 information, CS1 had extensive contacts with Suarez in

---

[14] Agent Johnson was the intended affiant but because he was unavailable when the Affidavit was presented to Judge Autrey, TFO Budds signed the affidavit.

the year leading up to August 5, 2012 and that CS1 had also been in contact with Gatling prior to August 5, 2012, although to a lesser extent than with Suarez. *See id.* at 93-96 & Govt. Exh. M-13. Toll and telephone record analysis, together with other historical information regarding Suarez's travel to St. Louis, also confirmed that, consistent with CS1's information, Suarez was in contact with CS1 in July 2012 when he traveled to St. Louis. *See id.* at 96-101 & Govt. Exh. M-14 & M-15. Telephone toll analysis further corroborated CS1's information regarding the sequence of calls between CS1, Suarez, and Gatling on August 5, 2012. *See id.* at 102-110, 113-114, 115-120, 126-128 & Govt. Exhs. M-19, M-20, M-21.

In addition to the above-mentioned telephone toll analysis, St. Louis agents were also able to corroborate information provided by CS1 through PLI data; historical information obtained from DEA and St. Louis Police databases about Suarez; physical surveillance; and the team's own collective historical knowledge of Gatling, Flenory, and the Black Mafia Family's drug trafficking activities. *See id.* at 109-110 (discussing importance of historical information), 120-123 (discussing the significance of PLI data and physical surveillance of Gatling's residence). In assessing the reliability of information provided by CS1, the St. Louis agents also relied on representations by Agent Cromer that he had overheard the calls between CS1, Gatling, and Suarez on August 5th and that CS1 had a history as a reliable DEA informant. *See id.* at 84-86, 123-125.

Based on their investigation and the collective experience of the St. Louis investigative team, Agent Johnson and his team concluded that conventional investigative tools such as physical surveillance, confidential informants, search warrants, trash seizures, electronic toll record analysis, witness and/or target interviews, grand jury investigations, police reports and other electronic surveillance such as trap and trace devices and tracking devices, and other methods would be of limited use in advancing the investigation. *See* Evid. Hrng. Tr. Vol. 7 (Doc. 428), at 114-137. As such, the St.

Louis investigative team applied for and, on August 28, 2012, obtained judicial authorization for a wiretap of Gatling's phone (Target Telephone 1) used on August 5, 2012.

## II.   CONCLUSIONS OF LAW

### A.   MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE BASED ON *FRANKS V. DELAWARE*

In *Franks v. Delaware,* 438 U.S. 154, 164 (1978), the Supreme Court held that, under limited circumstances, a defendant may attack the veracity of an Affidavit after the warrant has been issued and executed. In so holding, the Court recognized that notwithstanding the presumption of validity that attaches to an affidavit supporting a warrant, "when the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a ***truthful*** showing." *Id.* at 164-65 (quoting *United States v. Halsey,* 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966) (emphasis in original). As such, under the rationale of *Franks v. Delaware,* "[a] search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." *United States v. Conant,* 799 F.3d 1195, 1199 (8th Cir. 2015) (quoting *United States v. Reinholz,* 245 F.3d 765, 774 (8th Cir. 2001)).

To prevail on a *Franks* claim, defendants must establish by a preponderance of the evidence:

(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*Conant,* 799 F.3d at 1199-1200 (quoting *Reinholz,* 245 F.3d at 774).

For an affidavit to be truthful does not mean "'truthful' in the sense that every fact recited in the Affidavit is correct." *Franks,* 438 U.S. at 165; *see also United States v. Clapp*, 46 F.3d 795, 799 (8th

Cir. 1995) (quoting *Franks*).  This is so because "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks,* 438 U.S. at 165. In determining if an affiant's statements were made with reckless disregard for the truth, the test is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Conant,* 799 F.3d at 1200. (quoting *United States v. McIntyre,* 646 F.3d 1107, 1114 (8th Cir.2011)). "Recklessness, however, may be inferred from the fact of omission of information from an affidavit when the material omitted would have been clearly critical to the finding of probable cause." *Id.*

As the Supreme Court explained in *Franks,* the focus of the inquiry is whether the affiant, and not any non-governmental informant, deliberately or recklessly made a false statement. *Franks,* 438 U.S. at 171 ("the deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any non-governmental informant."). Thus, courts have generally held "the fact that a [non-governmental] third party lied to the affiant, who in turn included the lies in a Affidavit, does not constitute a *Franks* violation. A *Franks* violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth." *United States v. McAllister,* 18 F.3d 1412, 1417 (7th Cir. 1994) (quoting *United States v. Pritchard,* 745 F.2d 1112, 1119 (7th Cir. 1984). A *Franks* violation may still exist if a government agent (or an informant acting as a government agent) deliberately or recklessly misrepresents information to a second agent, who then innocently includes the misrepresentation in an affidavit or deliberately or recklessly omits information that is "clearly critical" to the finding of probable cause. *See id.; see also United States v. Jacobs,* 986 F.2d 1231, 1235-36 (8th Cir. 1993) (omission of the fact that drug sniffing dog failed to alert on a package was both reckless and "clearly critical" to the finding of probable cause).

24

   1.   **Defendants have failed to prove by a preponderance of the evidence that government agents deliberately or recklessly included false statements in the Affidavit that are material to the finding of probable cause.**

Defendants appear to contend that virtually all of the information in the Affidavit that was central to a probable cause determination was false, and suggest that all statements attributed to Agent Cromer and CS1 should be stricken from the Affidavit. *See* Deft.'s Post Hearing Br. (Doc. 459), p. 8-9 and Exh. B, Defts. Reformed Aff. (Doc. 454-2). However, based on the foregoing factual findings, with one exception discussed below, none of the statements in the Affidavit that were material to the finding of probable cause were false or misleading. It is significant that the only two witnesses at the evidentiary hearing with firsthand knowledge of the events of August 5th—Agent Cromer and CS1—testified consistently about the facts that are foundational to any probable cause determination in this case. [15]

Indeed, although the testimony of CS1 and the testimony of Agent Cromer were discordant on a number of points, CS1 and Agent Cromer were simpatico about the following: Fidel Suarez, a suspected source of supply to Defendant Gatling, contacted CS1 on August 5, 2012; Suarez told CS1 he had a truck in St. Louis for a narcotics transaction with Gatling; Suarez was having trouble reaching Gatling and asked CS1 for help; in attempting to help Suarez get in contact with Gatling, CS1 had a flurry of calls with Gatling and Suarez; and CS1 was ultimately successful in connecting Suarez and Gatling, who was using the telephone that became the target of the wiretap. These facts, which were incorporated into the Affidavit and are at the heart of any finding of probable cause to authorize a wiretap of Gatling's phone, were proven to be true based on testimony by CS1, testimony by Agent Cromer, and other evidence presented at the *Franks* hearing.

As the undersigned's factual findings demonstrate, all the other facts in the Affidavit, save the reference to "overhears" by DEA Atlanta agents via three-way calls are true. The Affidavit attests that

---

[15] Although the Affidavit repeatedly referenced DEA Atlanta agents, evidence presented at the hearing established that those references were almost exclusively a reference to Agent Cromer.

DEA Atlanta agents "had two overhears on conversations on that date which were telephonically established by CS#1 during three-way calls." Govt. Exh. M-1, at ¶ 23. The Affidvit further attests that "DEA Atlanta, Georgia monitored calls in three-way telephone connections established by CS#1 and were able to hear the conversation live, which included hearing CS#1 and the other party of the call, either Suarez and/or Gatling, depending on the call." Govt. Exh. M-1, at ¶23, note 8. Although the Affidavit states that "not all calls were monitored by the [DEA Atlanta] agents," it attests that DEA Atlanta Agents "confirmed that their overhear with Suarez was during the call between Suarez and CS1 during which time Suarez advised, 'I got these [f'ing] guys up there with this truck, I need to get in touch with [Gatling].'" *Id.* at ¶24.

As the factual findings demonstrate, while the Affidavit accurately states that DEA Atlanta Agents overheard a live conversation between CS1 and Gatling via a three-way call, the Affidavit is misleading to the extent it suggests that DEA Atlanta Agents also had a three-way call in which they overheard "live" a call in which Suarez told CS1 about the "f'ing truck" in St. Louis. Although CS1's telephone records clearly show a three-way call between CS1, Gatling, and Agent Cromer, no similar entry exists for a call between CS1, Suarez, and Agent Cromer.

The presence of these misleading, and perhaps even false, statements in the Affidavit is not a *Franks* violation. Given that the evidence clearly established that Agent Cromer overheard at least one call between CS1 and Gatling via a three-way call, and in light of evidence that Agent Cromer overheard and was clearly aware of the content of the call between CS1 and Suarez about the truck, it is entirely possible and plausible that, in relaying the nature of the overhears to the St. Louis agents, Agent Cromer mistakenly or inadvertently gave the impression to the St. Louis agents that he overheard both calls by three-way call. Given the evidence in this case, it is also plausible that St. Louis agents mistakenly assumed that Agent Cromer overheard both conversations via a three-way call, or failed to realize that

26

what Agent Cromer actually overheard "live" was CS1's recap of Suarez's statement during the three-way call between CS1 and Gatling. In any event, when all of the credible evidence of record is considered, defendants have failed to establish by a preponderance of the evidence that the statements about the three-way call overhears were made with reckless disregard for the truth, or that the affiant had "obvious reasons to doubt the accuracy of the information he reported." *Conant,* 799 F.3d at 1200. (quoting *United States v. McIntyre,* 646 F.3d 1107, 1114 (8th Cir.2011)).[16]

In sum, for the foregoing reasons, defendants' motion to suppress should be denied because defendants failed to prove by a preponderance of the evidence that any government agent or any informant acting as a government agent deliberately or recklessly included a false statement in the Affidavit that was material to a finding of probable cause.

### 2. Defendants have failed to prove by a preponderance of the evidence that facts material to a finding of probable cause were deliberately or recklessly omitted from the Affidavit.

Although defendants' position regarding omitted information is less than clear, defendants appear to suggest that suppression is warranted because the Affidavit failed to disclose Agent Cromer's inappropriate relationship with CS1 and failed to disclose inappropriate payments he may have authorized for CS1—information that defendants appear to tacitly acknowledge would go to CS1's reliability as an informant. Defendants can prevail on their *Franks* omission challenge only if they prove by a preponderance of the evidence that the Affidavit deliberately or recklessly omits information that is "clearly critical" to the finding of probable cause. *See United States v. McAllister,* 18 F.3d 1412, 1417 (7th Cir. 1994) (quoting *United States v. Pritchard,* 745 F.2d 1112, 1119 (7th Cir. 1984); *see also United*

---

[16] Because I conclude that the statements about the three-way calls were not deliberately made or made with reckless disregard for the truth, I need not reach the second prong of the *Franks* analysis. However, it is important to note that while the three-way call overhears help bolster the reliability of CS1's statements, they are not critical to finding probable cause. Even if the references to three-way call overhears were stricken as deliberate falsehoods, defendants' motion to suppress would fail because the Affidavit's remaining content would still be sufficient to establish probable cause.

*States v. Jacobs,* 986 F.2d 1231, 1234-36 (8th Cir. 1993). For the reasons set out below, defendants have not met their burden.

First, as the factual findings demonstrate, there is no evidence that any agent involved in preparing the Affidavit knew, or had reason to know that Agent Cromer was having an inappropriate relationship with CS1; nor is there evidence that agents preparing the Affidavit knew or had reason to know of any inappropriate payments to CS1. Even if, as defendants have suggested, Agent Cromer's knowledge of the relationship and allegedly improper payments can be imputed to the St. Louis agents, defendants have failed to demonstrate that the omitted information was "clearly critical" to the finding of probable cause.

An omission is a violation of *Franks* only if defendants make a showing "that the [agents] omitted the information with the intent to make, or in reckless disregard of whether they made, the affidavit misleading." *United States v. Jacobs,* 986 F.2d 1231, 1234 (8th Cir. 1993). The failure to include information and a reckless disregard for its consequences may be inferred from the fact that the information was omitted only if defendant shows that the omitted material would be "clearly critical to the finding of probable cause." *Id.* at 1235 (quoting *United States v. Reivich,* 793 F.2d, 957, 961 (8th Cir. 1986)). For example, in *Jacobs,* the Eighth Circuit held that information that a drug dog showed interest, but did not alert, on a package that was the subject of a search warrant application was such "highly relevant" information that "any reasonable person would have known that this was the kind of thing the judge would wish to know." *Id.* The court concluded that, given the highly relevant nature of the omitted information to the finding of probable cause, it was appropriate to infer from its omission that police omitted the information with a "reckless disregard of its effect upon the affidavit." *Id.*[17]

---

[17] The *Jacobs* court went on to hold that suppression was warranted. Applying the second prong of the *Franks* analysis, the court held that once the omitted information was included in the warrant affidavit,

As the factual findings in this case demonstrate, the circumstances presented here are easily distinguishable from the circumstances in *Jacobs.* The omitted information in *Jacobs*—i.e, negative results of a drug dog sniff—was information that was clearly central to the finding of probable cause. Here, given the significant amount of corroborative information St. Louis agents obtained about the information provided by CS1 and Agent Cromer, it is not at all apparent that the omitted information, which goes to CS1's reliability as an informant, was "clearly critical" to the finding of probable cause.

To be sure, it is well established that the statements of a reliable informant can, by themselves, be a sufficient basis for issuance of a warrant and that the informant's reliability, veracity, and basis of knowledge are relevant to finding probable cause when an affidavit is based in substantial part on information from an informant. *See Reivich*, 793 F.2d at 959; *United States v. McAtee*, 481 F.3d 1099, 1102 (8th Cir. 2007); *United States v. Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) (citing *McCray v. Illinois*, 386 U.S. 300 (1967)). However, it is equally well settled that "an informant who is correct about some things more likely will be correct about critical unverified facts." *Reivich*, 793 F.2d at 960 (citing *Spinelli v. United States*, 393 U.S. 410, 427 (1969)). Thus, "[w]here the informant's information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the findings of probable cause." *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992). Because it is undisputed in this case that DEA St. Louis agents were able to corroborate most of the information provided by CS1 and Agent Cromer, attacks upon CS1's credibility and reliability are simply "not crucial to the findings of probable cause." *Id.*

In sum, for the foregoing reasons, defendants motion to suppress should be denied because defendants failed to prove by a preponderance of the evidence that facts material to a finding of probable cause were deliberately or recklessly omitted from the Affidavit.

---

the application on its face would not support probable cause because "[w]ithout an alert, the police clearly lacked the probable cause necessary to open the package." *Jacobs,* 986 F.2d at 1235.

## B. MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE BASED ON FAILURE TO SATISFY THE NECESSITY REQUIREMENT

Under §2518(1)(c), each application for a wiretap authorization must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See United States v. Turner,* 781 F.3d 374, 382 (8th Cir. 2015) (quoting 18 U.S.C. § 2518(1)(c)). Section 2518(3)(c) similarly requires that in issuing a wiretap authorization order, the district court must determine whether "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous." *See United States v. West,* 589 F.3d 936, 939 (8th Cir. 2009) (quoting 18 U.S.C. § 2518(1)(c)). Together, these sections make up the necessity requirement for granting an order to receive wire intercepts from a phone.

It is well established that although wiretaps should not be "routinely used as the initial step in an investigation," the necessity requirement "does not require that law enforcement exhaust all possible techniques before applying for a wiretap." *Turner,* 781 F.3d at 383. "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each co-conspirator, the necessity requirement is satisfied." *Id.* at 382. Indeed, the Eighth Circuit has interpreted the necessity requirement to "restrict wiretaps to situations in which they are necessary as well as reasonable, but not to require the government to show the exhaustion of specific or all possible investigative techniques before wiretap orders could be issued." *United States v. Thompson,* 690 F.3d 977, 986 (8th Cir. 2012) (internal quotations omitted) (quoting *United States v. Daly,* 535 F.2d 434, 438 (8th Cir. 1976)). Moreover, whether the statutory requirement is met is a question of fact to be determined by the issuing judge "in a commonsense manner." *Id.*

Here, the foregoing factual findings demonstrate that, although St. Louis investigators decided early on to pursue a Title III wiretap investigation, the wiretap was not used as the initial step in the

investigation and, given the sophistication of the parties and complex logistical challenges, the agents had ample justification for pursuing a wiretap. The affidavit and the factual findings describe the various techniques used by law enforcement officials to gather evidence in the case. The affidavit and the factual findings describe in detail why some investigative techniques had failed or why they would be of no or limited value. The affidavit explained that the use of various techniques had failed or, based on the agents' experience, would fail to fully reveal the full scope of the conspiracy, its complete membership and methods of operation. Testimony by Agent Johnson and, to a lesser extent, TFO Lang at the suppression hearing confirmed the facts contained in the affidavit and further elaborated on those facts.

In sum, because the facts contained in the affidavit were sufficient to meet the necessity requirement, defendants' motion to suppress electronic surveillance evidence should be denied.

## III.    CONCLUSION

For all of the foregoing reasons, Defendants' Joint Motion to Suppress Electronic Surveillance evidence should be denied.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of January, 2018.

31