# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) 4:14 CR 00088 RWS (SPM) |
| | ) |
| DIONNE GATLING, | ) |
| TIMOTHY LAMONT RUSH, | ) |
| ANDRE ALPHONSO RUSH, and | ) |
| LORENZO RALPH GIBBS, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' JOINT POST-HEARING MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

### FACTS

The Defendants filed a Joint Motion to Dismiss the Superseding Indictment for Outrageous Government Conduct (Doc. 567). In that Motion the Defendants very clearly enunciated the misconduct of the Government culminating in two reverse sting operations which the Evidentiary Hearing disclosed started with the instigation of DEA Group Supervisor Cromer. Investigator Martinez was the Undercover Agent who first met with Gatling on February 4, 2013. Martinez testified that it was Agent Cromer who contacted him with regard to the initiation of a "reverse sting." (Tr. 119, 1-5). Martinez testified that he had been acquainted with and worked with Agent Cromer from 2007 through February, 2013 (Tr. 120, 3-10). His specific involvement commenced on February 4, 2013, and ended on February 13, 2013 (Tr. 123, 10-13). After his initial call from Agent Cromer to commence the ruse, Investigator Martinez reported to Agent Lang of DEA St. Louis (Tr. 122, 2-4).

Investigator Martinez stated that he was introduced to Defendant Gatling at a restaurant in

Atlanta by a Confidential Source who advised him that Gatling was looking for some drugs (Tr. 130, 11-12).  The subject Confidential Source for purposes of this Memorandum is known as "CS2."  In her deposition of August 29, 2016, CS2 testified as follows:

> Q. Sure.  Do you known if CS-1 had any motives with regards to Cuff; [Gatling] that is, whether she would be helping to get somebody's sentence reduced?
>
> A. (CS2)  I know she was trying to get someone's sentence reduced. That's what she said.  (Deposition of CS2, Aug. 29, 2016, p. 24, lines 10-14).

Further in her Deposition CS2 stated that CS1 was giving false information on Gating:

> Q. And to your knowledge, the person that CS-1 was giving false information to about Cuff was Agent Cromer?
>
> A. (CS2)  I don't know if she was giving it to him, but whoever she was giving the information to, it was not said the way it was supposed to be said. (*Franks* Ex. Gibbs:  Deposition of CS2, Aug. 29, 2016, p. 76, lines 17-22).

\* \* \* \*

> Q. Did you ever tell anyone with the DEA that CS No. 1 was lying to them about Cuff [Gatling]?
>
> A. (CS2)  Yes, of course.  I told Keith [Cromer] and I told Tony [Smith] and Dave [Aguilar].  I was like, that's not true what I said to her.  So they were aware that there were that she would state that were not true.
>
> Q. And specifically about the investigation related to Cuff [Gatling]?
>
> A. (CS2)  Yes, sir.

(*Franks* Ex. Gibbs 14:  Deposition of CS2, Aug. 29, 2016, p. 78, lines 21-25; p. 79, 1-4.)

To further support Defendants' contention that this was a strategy concocted by Agent Cromer, it was evident to Investigator Martinez, and he so testified, that Defendant Gatling never gave any indication to him that he possessed any money (Tr. 124, 23-25).  Further, Martinez testified that when he asked Gatling for a minimum of $5,000 to "front" the drugs, Gatling could not provide that amount (Tr. 125, 4-7). Gatling did not even have a vehicle suitable for the

2

transportation of drugs, so Martinez agreed to provide Gatling with a Cadillac Escalade with a secret compartment for hiding the fake drugs. In exchange, the only thing Gatling had to do let the DEA hold on to his old Toyota Camry - as security for $110,000 worth of drugs and the $60,000 Escalade. (Tr. 123, 19-25; 124, 1-25; 147, 1-17). After the first reverse sting in Memphis was concluded, Defendant Timothy Rush was arrested, the two kilograms of fake drugs were seized, and the DEA's loaner Cadillac was seized. The DEA then told Gatling he now owed $170,000 and would have to dramatically increase the quantities of the drugs - up to 15 kilograms - in order to pay down the fictitious debt they claimed he owed to the Mexican cartel. (Tr. 150, 1-25; 151, 1-7). The DEA thereby further manipulated the a false scenario which they created, orchestrated, acted as the sole supplier of the drugs and sole supplier the vehicle used to transport the drugs. The governmental manipulation precipitated the second sting (Tr. 125, 14-18) which culminated with the arrests of Defendants Timothy Rush and Lorenzo Gibbs and, thereafter, Martinez had no further communication with Gatling.

The testimony of Investigator Martinez supplements the allegations made in the Defendant's Motion, that is, at the behest of Agent Cromer, CS1 introduced Defendant Gatling to CS2 who, in turn, introduced him to the undercover agent, Investigator Martinez. The foundation for this subterfuge is predicated on the following:

    (a)    Agent Cromer and CS1 maintained an ongoing personal and illicit sexual relationship, wholly in contravention of the protocol of the DEA concerning a supervising agent and confidential source;

    (b)    Agent Cromer instructed CS1 to lie to various DEA agents concerning monies paid to her as well as the alleged criminal relationship between Flenory and Gatling and other targets of the Title III wiretap;

    (c)    Agent Cromer and CS1 both lied relative to the information contained in the initial Title III Affidavit from which all of the future investigations flowed.

3

      (d)    Agent Cromer used the initial fabrications and subsequent investigations to justify fraudulent payments to his girlfriend, CS1, payments totaling over $200,000.

      (e)    The DEA knew CS1 was lying about Gatling because CS2 told the DEA about this lies.

In response to the Defendants' Motion, the Government responded with a litany of allegations and facts which attempted to prove the absence of entrapment. They first detailed each of the Defendants' criminal history. The Government then alleged that Gatling had conducted a large scale drug deal with Fidel Suarez citing "overheard conversations" between CS1 and Fidel Suarez, as contained in the Affidavit of October 4, 2013. *See* Government's Response, p.p. 5-6. However, these mysterious overhears were never addressed at the evidentiary hearing which ostensibly occurred while TFO Lange was monitoring the phone calls of CS1 and Suarez. Lastly, the Government alleged that the statements and conduct of the Defendants during the reverse sting demonstrated their experience and propensity to distribute drugs.

What was missing both in the Government's Response and the witnesses presented at the Evidentiary Hearing was any reply to the allegations of the Government's outrageous conduct leading up to the reverse sting which occurred February 3 – 18, 2013. The Government argues that Defendants were simply re-hashing the *Franks* Hearing, however, quite to the contrary, in assessing whether the Government's conduct was "outrageous," the relevant question is what were the Government's actions leading up to the sting operations.

## MEMORANDUM OF LAW

The investigation and prosecution of the Defendants in this case offends the Fifth Amendment because the alleged crime was created by the Government and its agents. Under the Due Process Clause, "prosecution is barred where [p]olice over involvement in crime . . . reach [is] a demonstrable level of outrageous . . . ." *Hampton v. United States*, 425 U.S. 484, 495 (1976).

Due process expresses a "demand for civilized standards that are not defined by the specifically enumerated guarantees of the Bill of Rights. They neither contain the particularities

4

of the first Eight Amendments nor are they confined to them." *Louisiana ex rel. Francis v. Resewed,* 329 U.S. 459, 468 (1967). Thus, due process is itself an independent constitutional right; it is not dependent on or limited to violations of other constitutional provisions. The outrageous government defense does not imperil the separation of powers and, rather than representing a "chancellor's foot veto," safeguarding a defendant's due process rights is one of the constitutional duties of the judiciary. *United States v. Russell*, 411 U.S. 423, 435 (1973); *Haley v. Ohio*, 332 U.S. 596, 602 (1949).

The "outrageous government conduct defense" was born with Judge Rehnquist's *dicta* in *United States v. Russell*, 411 U.S. 423 (1973). *United States v. Berg*, 128 F.3d 976, 979 (8th Cir. 1999). In *Russell*, Justice Rehnquist began his opinion with the following:

> "While we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed."   *Russell,* 411 U.S. at 431.

The defense of outrageous conduct "focuses on the government's conduct," and "is distinct from entrapment which focuses on defendant's predisposition to commit a crime." *United States v. Berg*, 128 F.3d 976, 979 (8th Cir. 1999). Outrageous government conduct is a question of law to be resolved by the court, not the jury. *See United States v. Nguyen*, 250 F.3d 643, 645-646 (8th Cir. 2001). Furthermore, the "outrageous conduct defense is generally unavailable where the criminal enterprise was already in progress before the government became involved." *United States v. Augustine Med., Inc*., 2004 U.S. Dist. LEXIS 3911 (D.C. Minn. Mar. 3, 2004), (*quoting United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000).

Government conduct becomes constitutionally unacceptable when the conduct of the government agents is so outrageous that due process bans the government from invoking the

5

judicial process to obtain a conviction.  *See Russell*, 411 U.S. at 431-432.   The Eighth Circuit has recognized "outrageous government misconduct" and has stated that:

> While there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction, the level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court.  *United States v. Niemen*, 520 F.3d 834, 838 (8th Cir. 2008) (quoting *United States v. King*, 351 F.3d 859,867 (8th Cir. 2003) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).

If ever there was a case which would rise to the level of conduct that would "shock the conscience of the court," it is the instant case.

The Government cites the Eighth Circuit's recent discussion of the outrageous government conduct defense in *United States v. Combs*, 827 F.3d 790 (8th Cir. 2016).  While *Combs* did not find the government's conduct in that case sufficiently outrageous, the court did note two other cases that were dismissed due to outrageous government conduct.  In *United States v. Twigg*, 588 F.2d 373, 380 (3d Cir. 1978), the DEA asked an informant to approach the defendant about building a methamphetamine laboratory; the government provided everything needed for the laboratory, including difficult-to-obtain chemicals and land on which to build the laboratory; the defendant incurred no cost in building the laboratory.  *Id.* at 380–81. On these facts, the Third Circuit concluded that "the governmental involvement ... reached a demonstrable level of outrageousness." *Id.* at 380.  *Combs*, 827 F.3d at 795.

*Combs* also cited the Ninth Circuit case of *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), where an undercover agent encouraged the defendants to resume a discontinued bootlegging operation, provided necessary materials, threatened the defendants to accelerate production, and served as the defendants' sole customer. *Id.* at 786–87. The court overturned the conviction, holding that the government may not "involve itself so directly and continuously

6

over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787. *Combs*, 827 F.3d at 795.

The outrageous government conduct defense, while requiring an admittedly high threshold of "outrageousness" is not so beleaguered by precedent as to be *de facto* unavailable to these Defendants. As the Supreme Court has held, due process must not be "confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems v. United States*, 217 U.S. 349, 373 (1910).

The Supreme Court of Mississippi effectively stated the need for the kind of check on government misconduct by the outrageous government conduct defense: "We recall the lesson we all learned early in life, that he who gets in the gutter with the skunk is soon indistinguishable . . . for what would it profit us if we can be a drug-free society only to lose our soul as a people." *Tanner v. State*, 566 So. 2d 1246, 1250 (Miss. 1990). If the outrageous government conduct defense has truly become "moribund," then it is the responsibility of courts to employ a "judicial defibrillator" to bring the defense back from the brink and ensure its continuing validity. *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993).

The absence of a pre-existing criminal scheme is relevant to understanding the outrageous nature of the Government's conduct. In *Twig*, the Third Circuit found the government "implanted the criminal design in [the defendant's mind] . . . set him up, encouraged him . . ., and when he and [his co-defendants] encountered difficulties in consummating the crime, they assisted in finding solutions. *Twig,* 586 F.2d at 381.

In its Response, the Government asserts that the DEA knew Gatling had conducted a large-scale drug distribution deal with Fidel Suarez and in support of that proposition stated that

7

there was a link between Gatling and Demetrius Flenory, who was characterized as a "significant drug dealer," and was presently incarcerated. *See* Government's Response, p. 4. However, the only evidence adduced with regard to this alleged connection between Gatling and Felonry was through the testimony of CS1, who while testifying as a Government witness at the *Franks* Hearing, clearly denied all of the drugs trafficking links between Flenory and Gatling. She testified these were just lies Cromer told her to feed to the other agents. Not only did CS1 refute the Government's claims of a pre-existing operations with Gatling and Flenory, she openly committed perjury at the *Franks* Hearing and left all of her credibility sorely lacking at best.

In addition, while talking with CS2, CS1 admitted that her motive for talking about Gatling was trying to get her friend (Flenory's) sentence reduced. (*Franks* Ex. Gibbs 14: Deposition of CS2, Aug. 29, 2016, p. 24, lines 10-14). Moreover, not only did CS1 admit to CS2 that she was giving false information on Gatling to DEA Atlanta, but CS2 also advised DEA Atlanta that the information being provided by CS1 was false (*Franks* Ex. Gibbs 14: Deposition of CS2, Aug. 29, 2016, p. 78, lines 21-25; p. 79, lines 1-4). Cromer was obviously aware CS1 was lying to the DEA, because he was the person feeding her the lies and information to launder.

Further, in its Response, the Government relies on allegations that TFO Lang "overheard conversations between CS1 and Suarez" on August 23, 2012, regarding Gatling's purported negotiations with Suarez. This reliance is set forth in an Affidavit to Renew the Wire Interceptions on Gatling's phone, (314) 598-2330, and states that the information was gleaned on conversations that were "monitored by DEA agents but not recorded." *See* Government's Response, pp. 5-6. At the Evidentiary Hearing on June 27, 2018, the Government could have provided evidence concerning this issue but chose not to call TFO Lang or anyone else to

8

support this allegation contained within its Response.   As a result of absolutely no evidence to support this proposition, it must fail standing alone.

In *Greene,* a sting operation where the Government was acting as the buyer, the undercover agent convinced some old bootleggers to get back in to the business, offered to provide money and supplies for the still, and agreed "buy all the alcohol they could produce." *Greene*, 454 F.2d at 785.  When the bootleggers encountered difficulties, the undercover agent, acting a "big-time gangster" with the "syndicate" tried to spur production by telling the old bootleggers that "my boss in on my back" and "he kept on in order to get them to sell him some liquor."  *Id.* at 785-86.  The court found "this statement could only be viewed as a veiled threat." *Id.* 787.  Even though the defendants "talked in grandiose terms to criminal activity to impress the "syndicate man" and were have been found to have had "a predisposition to manufacture and sell bootleg whiskey," *Greene* dismissed the charges because "the Government's conduct rises to a level of '*creative* activity' substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined." *Id.* at 786-87 (emphasis original).

In the present case, the only "pre-existing criminal scheme" was taking place in the DEA's Atlanta office.   Cromer and CS1 targeted Gatling, who has not had a drug conviction or even a charge since 1995. The DEA in this reverse sting was acting as the seller of the drugs, and essentially agreed to supply Gatling with an unlimited supply of drugs with little or no preconditions. Whenever Gatling encountered difficulties in meeting any of the undercover agents' requirements, whether it was the $5,000 down payment, the vehicle to transport the drugs, or even meeting at an agreed time, the DEA simply waived the down payment and gave him the drugs with no money down, they provided Gatling with their own specialized vehicle to

9

transport the drugs they were giving him, and waited for hours for Gatling find a replacement driver and give him time to drive to Memphis.  After the first reverse sting, the DEA told Gatling that he owed $170,000 to the Mexican cartel and would need to escalate to 15 kilograms to start paying down this debt. A statement which could only be interpreted as a veiled threat.

The conduct of the DEA in this case not only involves the undue police involvement identified in *Hampton,* and later found in *Twig* and *Greene,* but this case also involves an unprecedented level of DEA misconduct – lies, sex scandal, fraud, deceit and even perjury - that clearly "falls within the narrow band of the most intolerable government conduct," namely, actions "violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." *United States v. Combs*, 827 F.3d at 794–95 (quoting *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003) and *Russell*, 411 U.S. at 432 (internal quotation omitted)).

The ruse initiated by Investigator Martinez was the culmination of various acts of Agent Cromer and CS1 which began months before.  At Cromer's instruction, CS1 passed Gatling off to CS2.  On February 4, 2013, at Cromer's request, CS2 passed Gatling off to Martinez.  Cromer then handed off control of the investigation to TFO Lang, although Cromer continued to reward CS1 for "work" on the Gatling cases, paying CS1 more than a dozen times after the February 4 handoff. (Def. *Franks* Ex. M)

The outrageous and criminal Government conduct which has permeated this case is extraordinary and one that is necessarily fact-specific.  Conduct which "shock the conscience" in one factual scenario might seem innocuous in a different setting; however, in the instant case, the fact-specific actions of Government agents present a bouillabaisse of governmental improprieties.  The DEA's misconduct has been extensively briefed in the post-hearing briefs on

10

the *Franks* hearing (DNs 454, 496) and the objections to the Report and Recommendation. (DN 571). These events are equally applicable to the Motion to Dismiss for Outrageous Government Conduct. By way of summary, these outrageous actions include:

1. In 2009, CS1 was acquainted with Gatling, not with regard to any drug dealing but rather, was working within the context of an entertainment movie project regarding Demetrius Flenory. Nevertheless, she told the DEA agents in St. Louis a story about her acting a broker for major drug deals involving Flenory, Gatling and Suarez, with CS1 collecting Flenory's cut. Although CS1 later admitted this was lie Cromer told her to tell to the other agents, the lie was retold on the original wiretap Affidavit.

2. According to her original controlling agent, Jack Harvey, CS1 "didn't know the drug game . . . [she] just wasn't familiar with drugs."

3. Nothing in any of the text messages, voicemails or any of the data on CS1's cellphone in any way suggests CS1 and Gatling were discussing any type of drug deals whatsoever. This fact was omitted from the Affidavit.

4. Commencing in late 2011, CS1 was engaged in an ongoing personal, sexual and illicit relationship with Agent Cromer who was her supervising agent. The affair continued throughout the Gatling investigation.

5. Cromer put CS1 "on the payroll" in October of 2011 and paid CS1 with government funds on almost a monthly basis throughout the Gatling investigation.

6. Cromer told subordinates to falsify DEA documents to justify the fraudulent payments to his girlfriend, CS1. Agent Swoope and TFO Aguilar were both aware of the false documentation and illegal payment scheme.

7. The payments to CS1 totaled over $200,000.

11

8. This intimate relationship and the manner in which CS1 was being paid were strictly prohibited by the rules and regulations of the DEA.

9. Prior to August 2012, CS1 learned of Fidel Suarez, a man with a trucking company in California who allegedly met Flenory in jail. CS1 and Suarez had never met.

10. CS1's phone data shows flirtatious exchanges of photographs and texts between CS1 and Suarez but no discussions of drugs.

11. CS1 also told Agent Johnson that Suarez was calling her all the time, pursuing a relationship, with conversations not related to drugs. TR-3 at 192-93.

12. Although the DEA had no idea of a relationship between Suarez and Gatling predating CS1 and Cromer, Cromer targeted Suarez as a potential source of supply and Gatling as a potential drug purchaser. When probable cause was not found, Cromer simply invented it.

13. On August 5, 2012, Suarez contacted CS1 in an attempt to give his phone number to their mutual acquaintance, Dionne Gatling.

14. The records from CS1's cellphone, which was produced in November of 2016, clearly reveal that Suarez had lost his phone and was asking CS1 to help Suarez reach Gatling. For example, after all of the contacts between CS1, Suarez, and Gatling on that date, Gatling sent a final text to CS1 stating "*He wasnt talk n bout nothing he lost his phone thats all*." CS1 responded "*Wow he called me like 20 times for that lol*."

15. During these conversations, CS1 contacted Cromer and asked him to call her about "business."

16. Cromer did not immediately call the DEA in St. Louis to advise them a "reliable confidential source" had reported a truck with narcotics was stuck in St. Louis waiting for

12

Gatling so the DEA could take some immediate action. Rather, the phone records show numerous calls between Cromer and CS1 during the two hours between her last contacts with Suarez and Gatling, but before Cromer's initial call to the DEA in St. Louis.

17. With CS1 secretly listening, Cromer told the DEA duty agent in St. Louis a fabricated a story claiming to have participated in a three-way call overhearing a live conversation between CS1 and Suarez in which Suarez claimed he needed to get in touch with Gatling, stating, "I got these fucking guys up there with this truck, I need to get in touch with him."

18. Cromer also falsely reported to DEA duty agent in St. Louis that when CS1 initially of a separate live three-way call between CS1 and Gatling and falsely claimed that CS1 "advised GATLING that a "truck" was in St. Louis and SUAREZ was attempting to contact him (GATLING), GATLING quickly responded "I know."

19.  Later that same day, August 5, a veteran DEA agent in Atlanta nearing retirement, Frederick Swoope, came into the DEA office on a Sunday and prepared a DEA Form 499 putting CS1 in for an award for an investigation in which she had no participation and which had nothing to do with Mr. Gatling, but was actually the work of CS#2 on a Mexican drug ring.  CS1 later received an $80,750 award/bribe based on Swoope's fraudulent DEA 499 prepared on August 5, 2012.

20. Agent Swoope was later told by Cromer to write a supplement to the August 5 award form to justify the $80,750 reward by falsely claiming that CS1 provided information about telephone numbers, conversations, and information that led to the seizure of $337,000 in September of 2012.

21. Agent Swoope was subpoenaed as a defense witness at the *Franks* hearing but invoked his rights under the 5th Amendment and refused to answer questions of this nature. In the OPR investigation, Swoope admitted to falsifying numerous DEA documents at Cromer's direction to authorize illegal payments to CS1.

22. With Cromer's false report that he had personally overheard two of CS1's phone calls – one with Suarez and one with Gatling, the DEA opened a formal investigation on Gatling the following day and held a conference call during which Cromer repeated these lies.

23. The DEA in St. Louis "went directly to a wiretap" and began preparing a wiretap affidavit for Mr. Gatling's phone.

24. In preparing this affidavit, the St. Louis agents attempted to confirm the information with CS1; however, Cromer asked DEA St. Louis to wait to speak with CS1 until after she was off work.

25. TFO Lang did not know whether CS1 was alone or with Cromer when Lang debriefed her.  In violation of DEA policy, TFO Lang destroyed his notes of this interview.

26. Cromer was on the line with CS1 when Agent Johnson questioned her about these calls.

27. These facts are of particular concern in light of the revelation that Cromer had, on other occasions, fed CS1 "information" and then instructed her to report it to other DEA agents as if she had first-hand knowledge in order to be fraudulently paid for the information. Cromer did it again in August of 2012, and CS1 was paid handsomely.

28. CS1's own testimony confirms her willingness to lie and her history of lying at Cromer's request: ***"If a government agent told me to lie at the time I'm trusting them, <u>absolutely I will lie</u> to trust them because they are telling me.***

29. All of these material facts are omitted from the Affidavit.

14

30. The affair itself was not only omitted from the Affidavit; the Affidavit expressly and falsely states in footnote 3, "*No derogatory information has been obtained on CS1 by DEA*."

31. As Cromer acknowledged during his testimony: "*When the time came for you to tell the agents in St. Louis about her credibility and vouch for her credibility, you didn't disclose that there was this personal unauthorized prohibited relationship, isn't that true?* A. *That's true. Correct.*

32. Agent Johnson who wrote the Affidavit testified: "*if I was aware of any inappropriate relationship between the CS and any DEA employee, especially a DEA employee involved with an investigation, I would not go forth with that information in any manner, because eventually the information would be discredited in the court of law.*"

33. Similarly, TFO Budds, the actual affiant, testified:  "*If you knew that Group Supervisor Cromer was engaged in some improper acts with CS1, would you have signed that affidavit on August 28, 2012?*"   A. *No, sir.*

34. Cromer also failed to tell the agents in St. Louis about the August 5, 2012 "award" or about CS1 dire financial problems and CS1's bankruptcy petition filed on August 23, 2012.

35. Similarly the Affidavit omits a text message from TFO Anthony Smith, a subordinate of Cromer, to CS1 sent on the morning of August 7, 2012—the morning after her debriefing with Lang stating "[CS1] they are gonna move forward in St. Louis with Fidel and *we are gonna get you paid* but I need info for them do you have any taped calls with Fidel or the Cuff guy?"

36. All of the derogatory information about the fraudulent payments to CS1, even the "award/bribe" given to her on August 5, 2012, are of course, excluded in the Affidavit.

37. CS1 stated that Cromer would provide her information to then pass on to other agents so as to "substantiate" the fraudulent payments she received – this unequivocally represents the depths of malfeasance and obfuscation of Agent Cromer in his duties as a DEA Group Supervisor.

38. Agent Cromer's conduct is reprehensible and is nothing more than orchestrating theft and/or embezzlement, as well as perpetuating a fraud, against the United States Government - all at the expense of Mr. Gatling and the other defendants in this case.

39. CS1's financial fortunes seemed to have quickly reversed after going along with Cromer's plan that August.  She arrived in a brand new white Lexus that fall at the meeting to hand off Gatling from CS1 to CS2.

40. The Affidavit includes all of the false information from Cromer and CS1 about CS1's credibility and the fictitious three-way calls that were the foundation of the alleged probable cause to wiretap of Gatling's phone.  That initial wiretap launched this entire investigation.  This Affidavit also includes a number of other false statements.

41. The Affidavit also falsely stated that "Gatling began using Target Telephone #1 to talk to Suarez in February 2012."

42. The Affidavit falsely claims multiple "Agent<u>s</u>" overheard these three-way calls.

43. The Affidavit falsely states there was a 10 minute call between the false "F'ng truck" call with CS1 and Suarez and the later call between CS1 and Gatling in which he is falsely reported to have said, "I know" in response to the CS1 report of the imaginary truck stuck in St. Louis.

44. The Affidavit's repeatedly states the *"[e]vents as described by CS1 and by DEA Atlanta were confirmed by the toll analysis."* These statements are false as they relate to the critical three-way truck call, are false as to an extra ten minute call between Suarez and Gatling, and omit material information about the limitations of the telephone data itself.

45. The Affidavit also fails to disclose that the toll analysis data on Suarez's VOIP number was "*a little incomplete*." "These peer-to-peer calls on the Internet-based calls, *the data is extremely inconsistent, extremely unreliable*." In fact, subpoenaed toll records from Pinger actually showed no contacts for the VOIP number 213-260-2841 on August 5, 2012.

46. The Affidavit also omitted the fact that the toll analysis is entirely consistent with what actually happened. Suarez lost his old phone and contacted CS1 so she could give Gatling his new number. Suarez told CS#1 to give Gatling his new number because "*I lost the other phone*." Less than an hour later, Gatling sent a text to CS#1 stating "*He wasnt talk n bout nothing he lost his phone thats all*." CS#1 responded "*Wow he called me like 20 times for that lol*."

47. At the time of the introduction of Investigator Martinez in early 2013, CS1 [and thereby Cromer] knew that Defendant Gatling possessed neither monies nor assets as his attempts to finance an entertainment project were floundering

48. Last but not least, the Cromer and CS1's outrageous conduct did not cease in 2012 or 2013, but was on full display again with both perjured themselves at the *Franks* Hearing by lying about the three-way "F'ng truck call" that was the very heart of the probable cause alleged in the Affidavit.

49. As a result of his conduct as hereinbefore alleged, the Government has provided

    Defendants confirmation that Agent Cromer had his security clearance revoked and has been suspended without pay by the Drug Enforcement Agency.

50. Agent Cromer is also the target of investigations by both the Office of Inspector General and the Office of Professional Responsibility.

If these 50 statement of outrageous government conduct are not enough to convince the Court that this conduct "shocking to the universal sense of justice," then the Court only needs to recall the expression on Agent Johnson's face while Cromer testified or TFO Budds' face when he was asked if he would have signed the TIII affidavit if he know Cromer was having an affair with CS1.

As a result of the foregoing Government outrageous conduct, Defendants also seek the dismissal of Counts VI through IX through the "fruit of the poisonous tree doctrine" as the Government's case is derivative from its outrageous conduct. *See United States v. Toscanini*, 500 F.2d 267, 275 (2d Cir. 1974); *see also United States v. Cyprian*, 23 F.3d 1189, 1197 (7th Cir. 1994). In *Toscanini,* the Second Circuit prohibited the government from prosecuting a defendant who was forcibly detained and brought within the jurisdiction of the court. The Second Circuit held that dismissal was required because "the court's acquisition of power of [the defendant] represents the fruits of the government's exploitation of its own misconduct." *Toscanini*, 500 F.2d at 275.

Similarly in the *Cyprian* case, while the court did not find outrageous government conduct, it held that a defendant "has the right to challenge government conduct **causally related** to his conviction and thus has standing to raise an outrageous government conduct claim" as to the investigation of his co-defendants." *Cyprian*, 23 F3d at 1197 (emphasis added).

Here, the Government's case against Defendants Timothy Rush, Andre Rush and Lorenzo Gibbs derives from its outrageous conduct in pursuing Defendant Gatling. While this is

18

not a case of forcible detention like *Toscanini*, the same principle applies: the Indictment against all the Defendants is "the fruit of the government's exploitation of its own misconduct." *Toscanini,* 500 F.2d at 275. Therefore, in light of the foregoing, Defendants pray that this Court dismiss the Superseding Indictment with prejudice

The United States Supreme Court has vested in his Court the ability to exercise its supervisory power in three (3) situations: "[T]o implement a remedy for violation of recognized rights; to preserve judicial integrity by insuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy to deter illegal conduct*." United States v. Hastings*, 461 U.S. 499, 505 (1983).

For four years this Court has been asked to oversee a parade of DEA Atlanta's dirty laundry through its courtroom. The Court is once again asked to turn a blind eye to this reprehensible government conduct and allow the parade to continue. The outrageous and illegal government conduct in this case impugns the integrity of this Court, violates the rights of the accused, and placating it fails to deter similar illegal government conduct. The continued sanction of this outrageous and illegal government conduct should end today.

Respectfully Submitted,

*/s/* **JoANN TROG**
JoAnn Trog                             42725MO
Attorney for Dionne Gatling
121 West Adams Avenue
Saint Louis, Missouri 63122
 Telephone:     (314) 821-1111
 Facsimile:     (314) 821-0798
 E-mail:        jtrogmwb@aol.com

19

/s/ **PRESTON HUMPHREY, JR.**
Preston Humphrey, Jr.
Attorney for Timothy Lamont Rush
1015 Locust Street, Suite 413
Saint Louis, Missouri 63101
Telephone: (314) 621-1765
Facsimile: (314) 621-0020
E-mail: phumphrey@phlawstl.com


/s/ **ROBERT HERMAN**
Robert Herman
Attorney for Andre Alphonso Rush
8820 Ladue Road, Suite 201
Saint Louis, Missouri 63124
Telephone: (314) 862-0200
Facsimile: (314) 8620-3050
E-mail: bherman@laduelaw.com


/s/ **STEPHEN R. WELBY**
Stephen R. Welby
Federal Public Defender
Attorney for Lorenzo Ralph Gibbs
650 Missouri Avenue, Suite G-10A
East St. Louis, Illinois
Telephone: (618) 482-9050
E-mail: steve_welby@fd.org


## CERTIFICATE OF SERVICE

Signature of the foregoing document is also certification that a true and correct copy has been filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon Dean Hoag, Michael Reilly and Tiffany Becker, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, Saint Louis, Missouri 63102 on this 2nd day of August, 2018.


/s/ **JoAnn Trog**